PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

TIMOTHY ANDREW FUGIT,

      *Defendant-Appellant.*

No. 11-6741

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Jerome B. Friedman, Senior District Judge.
(4:07-cr-00065-JBF-JEB-1; 4:09-cv-00135-JBF-DEM)

Argued: October 25, 2012

Decided: December 31, 2012

Before TRAXLER, Chief Judge, and WILKINSON and
AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Chief Judge Traxler and Judge Agee joined.

---

## COUNSEL

**ARGUED:** Mary Beth Usher, WAKE FOREST UNIVER-
SITY SCHOOL OF LAW, Winston-Salem, North Carolina,
for Appellant. Richard Daniel Cooke, OFFICE OF THE
UNITED STATES ATTORNEY, Richmond, Virginia, for

Appellee. **ON BRIEF:** John J. Korzen, Director, Melissa Evett, Third Year Law Student, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Appellate Advocacy Clinic, Winston-Salem, North Carolina, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Lisa R. McKeel, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

Timothy Andrew Fugit moves for post-conviction relief in connection with his guilty plea for enticing or attempting to entice a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b). The district court denied Fugit's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. For the reasons that follow, we affirm the judgment.

### I.

A grand jury in the Eastern District of Virginia returned a two-count indictment against Fugit on May 24, 2007. Count One charged him with distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1). Count Two charged him with violating 18 U.S.C. § 2422(b), which provides, in pertinent part:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or

attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

Count Two alone is at issue here.

On the advice of counsel, Fugit pleaded guilty to both counts on July 20, 2007. Although Fugit and the government did not enter a formal plea agreement, the parties agreed to a stipulated "Statement of Facts." This document described the following foundations for the charges.

On November 28, 2005, while claiming to be a young girl named "Kimberly," Fugit held a conversation in an internet chat room with an eleven-year-old girl, "Jane Doe #2." He asked her questions regarding her breasts and genitals, her underwear, slumber parties, and whether she had ever appeared naked in front of men. He also obtained her telephone number. Pretending to be Kimberly's father, Fugit telephoned Jane Doe #2 shortly thereafter and engaged her "in an inappropriate sexual conversation." He asked whether she had "seen a grown man naked," whether "she minded if he came in to check on her while she was naked," whether "she would mind seeing him naked," and whether she would "get naked for him." Tracking the text of 18 U.S.C. § 2422(b), the Statement of Facts concluded its discussion of this incident by noting that Fugit "admits that he knowingly persuaded, induced, enticed or coerced Jane Doe #2 to engage in a sexual activity, to wit; Taking Indecent Liberties with Children, in violation of § 18.2-370 of the Code of Virginia 1950, as amended, for which he could be charged."

Likewise, on December 12, 2005, once more posing as "Kimberly," Fugit chatted online with a ten-year-old girl, "Jane Doe #1," and obtained her telephone number. Approximately five minutes later, he telephoned her, pretended to be Kimberly's father, and engaged her "in an inappropriate sexual conversation." The Statement of Facts further described how this latter incident precipitated an extensive police inves-

tigation. During the execution of a search warrant at his residence, Fugit told police that he had "attempted to contact children on the computer and telephone" and that an internet account of his had been "bumped" several times because of inappropriate contact with minors. Law enforcement discovered, "among other things" on Fugit's computer, that he had once distributed a child pornography image over e-mail.

Additionally, at his sentencing hearing, Fugit effectively admitted the facts contained in the pre-sentence report (PSR) prepared by the probation office. Specifically, he contested only one allegation, which is not at issue here, and affirmed that the remainder of the factual background was error-free. The PSR revealed a great deal of information beyond that contained in the Statement of Facts.

Apparently referencing the incidents discussed above, the PSR described how Fugit, in claiming to be Kimberly's father, asked Jane Doe #2 "to masturbate and take her shirt off" and repeatedly demanded that she remove her pants. And with regard to Jane Doe #1, among other statements, Fugit "informed her of the rules he would impose" if she spent the night at his house, "instructed her to call him 'Daddy,'" and stated that he "would perform a 'finger test' on [her] by rubbing her all over with his finger." Additionally, he said "that he would allow her to touch his penis" and asked her "to take her clothes off."

Moreover, the PSR made clear that the incidents involving Jane Does #1 and #2 were anything but isolated occurrences. Investigation revealed that Fugit had participated in internet chats with 129 individuals who appeared to be children, twelve of whom police confirmed were indeed minors between nine and twelve years old. During these dozen conversations, which occurred between March 2005 and January 2006, Fugit "always represented himself to be a child and often asked inappropriate questions," including

the child's breast size, whether or not the child had pubic hair, whether or not the child slept in the nude, whether or not the child engaged in masturbation, what type of underwear the child wore, and whether or not the child had been naked in front of a member of the opposite sex.

As with Jane Does #1 and #2, Fugit often proceeded to engage these children in telephone conversations involving "inappropriate sexual comments."

Finally, the PSR disclosed that 289 still images and twenty-four videos of child pornography—at least some of which were extremely graphic—were found on Fugit's computers. In addition to the single occasion described in the Statement of Facts, the PSR revealed that law enforcement identified forty-three instances of child pornography distribution between September 2004 and January 2006, some involving multiple images.

Following a hearing on December 19, 2007, the district court sentenced Fugit to 240 months of imprisonment on Count One (the statutory maximum) and seventy months of imprisonment on Count Two, to be served consecutively, yielding a sentence of 310 months from a guideline range of 292 to 365 months. Represented by the same counsel as during the initial plea proceedings, Fugit appealed only his sentence, and this court affirmed the judgment of the district court. *United States v. Fugit*, 296 F. App'x 311 (4th Cir. 2008) (per curiam).

On October 1, 2009, Fugit filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255. He contested his convictions on ten grounds. The district court denied the motion in its entirety, rejecting each of Fugit's claims on the merits and also seeming to find that several were procedurally defaulted. This court granted a certificate of appealability on the following issues, which relate to Count Two only: (1)

"whether Fugit's stipulated conduct constituted attempted inducement of 'sexual activity' of a minor within the meaning of 18 U.S.C. § 2422(b)" and (2) "whether Fugit's counsel rendered ineffective assistance by advising him to stipulate to the inducement of 'sexual activity' and guilt under 18 U.S.C. § 2422(b)."

## II.

We underscore at the outset of our review the interest of the criminal justice system in the finality of convictions, an interest repeatedly confirmed the Supreme Court. *See, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 492-93 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 n.13 (1977). "The historical evidence demonstrates that the purposes of the writ [of habeas corpus], at the time of the adoption of the Constitution, were tempered by a due regard for the finality of the judgment of the committing court." *Schneckloth v. Bustamonte*, 412 U.S. 218, 256 (1973) (Powell, J., concurring). Relitigation of a conviction is a rear-view mirror, while a respect for finality encourages those in custody to contemplate the future prospect of "becoming a constructive citizen." *Id.* at 262.

The Supreme Court has declared, moreover, that "the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas." *United States v. Timmreck*, 441 U.S. 780, 784 (1979). In explaining this corollary to the finality principle, the Court remarked:

> Every inroad on the concept of finality undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice. The impact is greatest when new grounds for setting aside guilty pleas are approved because the vast majority of criminal convictions result from such pleas.

*Id.* (quoting *United States v. Smith*, 440 F.2d 521, 528-29 (7th Cir. 1971) (Stevens, J., dissenting)). In addition to emphasizing the sheer volume of guilty pleas, the Supreme Court has located independent value in the fact that such a plea "usually rest[s] . . . on a defendant's profession of guilt in open court," *United States v. Dominguez Benitez*, 542 U.S. 74, 82-83 (2004), and allows him to demonstrate "that he is ready and willing to admit his crime and to enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary," *Brady v. United States*, 397 U.S. 742, 753 (1970). On the strength of these rationales, this circuit has long refused to permit the casual withdrawal of guilty pleas. *See, e.g.*, *United States v. Lambey*, 974 F.2d 1389, 1394 (4th Cir. 1992) (en banc).

Though high, the bar of finality is not insurmountable, even in the guilty plea context. It bears emphasis, however, that allowing a person to abrogate his guilty plea on collateral attack represents a rare exception to the rule of finality, and we proceed to review Fugit's claims with this foundational principle in mind.

### III.

Fugit's primary contention is that the district court erred in interpreting 18 U.S.C. § 2422(b), the statute underlying his conviction on Count Two. The government argues, however, that the doctrine of procedural default bars this claim because Fugit failed to raise it during his initial plea proceedings or on direct appeal. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982)). This doctrine, too, rests on the law's basic interest in finality. *Id.* ("The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.").

Fugit did not make the statutory argument he now presses during his initial plea proceedings before the district court, and although he "contested his sentence on appeal, [he] did not challenge the validity of his plea." *Bousley v. United States*, 523 U.S. 614, 621 (1998). It would appear, therefore, that Fugit has procedurally defaulted this claim. *See id.*

A procedural default, however, may be excused in two circumstances: where a person attacking his conviction can establish (1) that he is "actually innocent" or (2) "cause" for the default and "prejudice" resulting therefrom. *Id.* at 622. While a successful showing on either actual innocence or cause and prejudice would suffice to excuse the default, Fugit contends that he can accomplish both. We consider Fugit's actual innocence claim first—an analysis that, incidentally, requires us to resolve the underlying statutory dispute.

As outlined above, 18 U.S.C. § 2422(b) comprises four elements: "(1) use of a facility of interstate commerce; (2) to knowingly persuade, induce, entice, or coerce; (3) a person who is younger than eighteen; (4) to engage in an illegal sexual activity." *United States v. Kaye*, 451 F. Supp. 2d 775, 782 (E.D. Va. 2006). Fugit's claim of actual innocence focuses exclusively on the "sexual activity" component of the fourth element. He contests neither the other three elements nor the illegality component of the fourth, effectively conceding that his behavior violated § 18.2-370 of the Code of Virginia, which prohibits taking indecent liberties with children. Fugit acknowledges that his behavior was—to put it mildly—"reprehensible." Nevertheless, he argues that the phrase "sexual activity" in § 2422(b) incorporates an irreducible minimum of interpersonal physical contact—and that, because the relevant interactions with his victims neither included nor referenced such contact, he cannot have been guilty of violating the statute.

We first interpret the phrase "sexual activity" as used in § 2422(b) and then proceed to apply that interpretation to Fugit's actual innocence claim.

## A.

For the reasons that follow, we hold that interpersonal physical contact is not a requirement of § 2422(b)'s "sexual activity" element.

"Statutory interpretation necessarily begins with an analysis of the language of the statute." *Chris v. Tenet*, 221 F.3d 648, 651 (4th Cir. 2000). As far as the text of § 2422(b) is concerned, Fugit appears to have pulled his proposed interpersonal physical contact requirement out of a hat. The statute is simply not framed in the terms for which he contends: it mentions nothing about physical contact. In fact, it does not expressly demarcate the meaning of "sexual activity" in any way, instead leaving the term undefined. By contrast, where similar statutory terms were meant to encompass only a specific subset of conduct, Congress took care to define them explicitly for purposes of the sections or chapters in which they are found. *See, e.g.*, 18 U.S.C. § 2246(2) (defining "sexual act"); *id.* § 2246(3) (defining "sexual contact"); *id.* § 2256(2) (defining "sexually explicit conduct"); *id.* § 2423(f) (defining "illicit sexual conduct").

When analyzing the meaning of an undefined statutory term, "we must first 'determine whether the language at issue has a plain and unambiguous meaning.'" *Chris*, 221 F.3d at 651 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). We think the meaning of "sexual activity" in § 2422(b) is indeed plain and that this meaning extends beyond interpersonal physical contact.

This court has long consulted dictionaries of common usage in order to establish the plain meaning of disputed statutory language. *See Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 289 (4th Cir. 1998). In determining the meaning of "sexual," we find instructive a definition from Webster's: "of or relating to the sphere of behavior associated with libidinal gratification."

*Webster's New International Dictionary* 2082 (3d ed. 1993). This court has previously relied on this very definition in a related context. *See United States v. Diaz-Ibarra*, 522 F.3d 343, 349 (4th Cir. 2008) (interpreting the phrase "sexual abuse of a minor" for purposes of sentencing enhancement in U.S. Sentencing Guidelines Manual § 2L1.2). Likewise, we find the most pertinent definition of "activity" to be "an occupation, pursuit, or recreation in which a person is active." *Webster's*, *supra*, at 22.

Thus, as a matter of plain meaning, the phrase "sexual activity" as used in § 2422(b) comprises conduct connected with the "active pursuit of libidinal gratification" on the part of any individual. The fact that such conduct need not involve interpersonal physical contact is self-evident. *See Diaz-Ibarra*, 522 F.3d at 351-52 (concluding that "'sexual abuse of a minor' means the 'perpetrator's physical *or nonphysical* misuse or maltreatment of a minor for a purpose associated with sexual gratification'" (emphasis added)).

This meaning of the "sexual activity" element is not only plain; it also renders the statutory scheme coherent as a whole. This court has made clear that § 2422(b) "was designed to protect children from the act of solicitation itself." *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012) (quoting *United States v. Hughes*, 632 F.3d 956, 961 (6th Cir. 2011), *cert. denied*, 131 S. Ct. 2975 (2011)). Consequently, by forbidding the knowing persuasion, inducement, enticement, or coercion of a minor, the statute "criminalizes an intentional attempt to achieve a *mental* state—a minor's assent—regardless of the accused's intentions concerning the actual consummation of sexual activities with the minor." *Id.* (quoting *United States v. Berk*, 652 F.3d 132, 140 (1st Cir. 2011)). The primary evil that Congress meant to avert by enacting § 2422(b) was the psychological sexualization of children, and this evil can surely obtain in situations where the contemplated conduct does not involve interpersonal physical contact.

We cannot accept Fugit's contention that absent an interpersonal physical contact requirement, § 2422(b) becomes a trap capable of snaring all sorts of innocent behavior. For several reasons, our interpretation of the term "sexual activity" is hardly open-ended. First, wide swaths of behavior simply cannot be described as "sexual activity": indeed, the overwhelming preponderance of human interaction does not involve the "active pursuit of libidinal gratification" in any minimally tenable way.

Second, § 2422(b) concerns only conduct that is already criminally prohibited. That is, § 2422(b) does not criminalize enticement of "sexual activity," full stop; instead, it forbids enticement of "sexual activity *for which any person can be charged with a criminal offense*." The latter category is considerably narrower than the former. As a general matter, conduct that is innocuous, ambiguous, or merely flirtatious is not criminal and thus not subject to prosecution under § 2422(b).

Third, § 2422(b) addresses only behavior involving children. And there exists, of course, a vast range of everyday adult-child interactions that are neither remotely erotic nor independently illegal—from the salutary mentoring of teachers, coaches, and counselors to the unintentional jostling between strangers traversing a crowded city sidewalk.

Finally, we believe that the Seventh Circuit's decision in *United States v. Taylor*, 640 F.3d 255 (7th Cir. 2011), upon which Fugit places great weight, was mistaken. The *Taylor* court held that the phrase "sexual activity" in § 2422(b) is synonymous with the phrase "sexual act," as defined in 18 U.S.C. § 2246(2). *Id.* at 259-60. That complex provision defines "sexual act" to require not only interpersonal physical contact but interpersonal physical contact involving the genitalia or anus—and, for persons who are sixteen or older, requires either oral sex or actual penetration of the genital or anal opening.

We decline *Taylor*'s invitation to cut and paste this restric-
tive definition into § 2422(b) because doing so would contra-
vene express statutory text. Section 2246 explicitly limits the
definitions provided therein to the chapter in which it resides.
Specifically, the very first words of the section are "[a]s used
in this chapter" (with the various definitions following), and
the section's title is "[d]efinitions for chapter." Whereas
§ 2246 appears in Chapter 109A of Title 18, § 2422(b) is situ-
ated in an entirely different location, Chapter 117. Simply put,
we find "no indication that Congress intended to import the
definitions of chapter 109A to [another] chapter." *United
States v. Sonnenberg*, 556 F.3d 667, 670 (8th Cir. 2009).

For the foregoing reasons, we hold that the phrase "sexual
activity" in § 2422(b) denotes conduct connected with the
"active pursuit of libidinal gratification" on the part of any
individual—nothing more, nothing less—and, therefore, does
not incorporate an invariable requirement of interpersonal
physical contact.

B.

Having thus determined the interpretation of § 2422(b)'s
"sexual activity" element, we must analyze whether the con-
duct at issue in this case supports Fugit's claim of actual inno-
cence. In order to succeed, Fugit "must demonstrate that, 'in
light of all the evidence,' 'it is more likely than not that no
reasonable juror would have convicted him.'" *Bousley*, 523
U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28
(1995)).

1.

At the threshold of the actual innocence inquiry, the parties
spar over what universe of facts this court may take into
account. Fugit asserts that this universe is small and strictly
bounded. Invoking the precise text of the certificate of
appealability, Fugit contends that our review is limited to

whether his "*stipulated conduct* constituted attempted induce-ment of 'sexual activity' of a minor within the meaning of 18 U.S.C. § 2422(b)." He further argues that "stipulated conduct" refers only to the Statement of Facts to which he conceded as part of his guilty plea.

For several reasons, we think that the range of relevant con-duct is significantly broader—even assuming that Fugit is cor-rect that the phrase "stipulated conduct" in the certificate of appealability denotes only the conduct discussed in the State-ment of Facts. We are guided, first, by the Supreme Court's clear instruction that, because acceptance of a claim of actual innocence from someone previously adjudicated guilty repre-sents an extraordinary form of relief, the scope of pertinent evidence is expansive. *Schlup*'s requirement that a person prove actual innocence "in light of *all* the evidence" points to this principle, 513 U.S. at 328 (emphasis added), and in *Bous-ley*, the Court made it explicit:

> It is important to note . . . that "actual innocence" means factual innocence, not mere legal insuffi-ciency. In other words, the Government is not lim-ited to the existing record to rebut any showing that petitioner might make . . . [and may rely on] any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy . . . .

523 U.S. at 623-24.

Moreover, the Supreme Court has specifically linked the notion that actual innocence claims must surmount a high hur-dle to the systemic interest in finality. *See, e.g.*, *Schlup*, 513 U.S. at 324 (describing actual innocence jurisprudence as "seek[ing] to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individ-ual interest in justice that arises in the extraordinary case"); *Sawyer v. Whitley*, 505 U.S. 333, 345 (1992) ("[P]etitioner's

standard [for actual innocence claims] would so broaden the inquiry as to make it anything but a 'narrow' exception to the principle of finality that we have previously described it to be."). Given the Court's pronouncements, we can only greet skeptically Fugit's effort to constrict the universe of evidence relevant to his belated actual innocence claim.

Second, *Gonzalez v. Thaler*, 132 S. Ct. 641 (2012), confirms the propriety of considering a broad base of evidence despite the arguably narrow span of the certificate of appealability. At issue in *Gonzalez* was 28 U.S.C. § 2253(c), which requires that a person seeking to challenge an adverse district court judgment on collateral attack obtain a certificate of appealability. Specifically, § 2253(c) provides:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The *Gonzalez* Court determined that, whereas the baseline requirement of a certificate's existence in § 2253(c)(1) is

jurisdictional in nature, the directive stated in subsection (c)(3) constitutes a mere "claim-processing rule" and is consequently non-jurisdictional. *Id.* at 648-49. "Accordingly," the Court decided, "a judge's failure to 'indicate' the requisite constitutional issue . . . does not deprive a court of appeals of subject-matter jurisdiction to adjudicate [an] appeal." *Id.* at 646.

By holding that the specific wording of the certificate of appealability does not limit a court's ability to adjudicate a collateral attack as a matter of subject matter jurisdiction, *Gonzalez* directs the conclusion that the reference to "stipulated conduct" in the certificate does not constrain our consideration of Fugit's actual innocence claim in view of all of the evidence in the record. In light of *Bousley*'s unequivocal message that resolving such claims on an artificially restricted record would eviscerate the critical systemic interest in finality, we believe that we would be mistaken to confine our analysis to the stipulated Statement of Facts. *Gonzalez* confirms that we need not do so.

And third, to treat the certificate of appealability as circumscribing the permissible ambit of arguments offered by the government—as Fugit would have it—entirely upends congressional intent as to the nature of appellate review over collateral challenges to convictions. The Federal Rules of Appellate Procedure make manifest that while the convicted individual "cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)," a certificate "is not required when a state or its representative or the United States or its representative appeals." Fed. R. App. P. 22(b)(1), (3); *see also* Fed. R. App. P. 22 advisory committee's note. The fact that the government need not obtain a certificate of appealability at all strongly indicates that the function of the certificate is to restrain the appeal of insubstantial claims on collateral attack, not to restrict artificially the government's capacity to respond to them.

Although we thus decline to confine our review of Fugit's actual innocence claim to the Statement of Facts, we find it unnecessary to explore the outer parameters of permissible evidence. In particular, the facts set forth in the PSR stand on a different—and firmer—footing than does other potentially inculpatory evidence uncovered during the police investigation. As discussed above, *Bousley* speaks of "*admissible* evidence of petitioner's guilt." 523 U.S. at 624 (emphasis added). Here, Fugit conceded the conduct discussed in the PSR in open court (besides one allegation upon which we do not rely), and the trial judge accordingly used those allegations as the basis for his sentencing calculations, which this court has affirmed. There is no need for us to address other evidence.

2.

With the boundaries of inquiry thus established, Fugit's actual innocence claim fails by a wide margin.

Given the interpretation of § 2422(b)'s "sexual activity" element established above, Fugit falls far short of proving that "it is more likely than not that no reasonable juror would have convicted him" on Count Two, the § 2422(b) enticement charge. *Schlup*, 513 U.S. at 327. In fact, Fugit's conceded conduct so surely satisfies the "sexual activity" element that it is difficult to conceive of any reasonable juror *not* convicting him.

Count Two appears to have been based on Fugit's behavior toward Jane Doe #2. The conduct described in the PSR with respect to this victim is condemnatory. Fugit tricked this eleven-year-old child into providing her telephone number during an online chat in which he pretended to befriend her as a girl named "Kimberly." During that chat, Fugit "inquired as to the child's breast size, her underwear, and whether or not she had been nude in front of boys." When he telephoned her, "[t]he victim asked to speak to Kimberly, however, the defendant refused and stated that he was Kimberly's father

and needed to ask the victim some questions first." Later in the conversation, he "inquired as to where the victim's parents were and told her he wanted her to go to another room." Fugit thus attempted to lure this young girl away from her protectors in hopes of exploiting her undisturbed. The PSR further describes Fugit's telephone inquiries to Jane Doe #2 "about her underwear and bras" and whether she "had seen other girls naked," had been "in a hot tub with other girls and boys," had "seen a grown man naked," and "would mind seeing him naked." Following these questions, Fugit requested that she remove her shirt and, on more than one occasion, demanded that she take off her pants as well. He also asked her to masturbate. That such conduct qualifies as involving the "active pursuit of libidinal gratification" on Fugit's part is beyond question.

Nor is the conduct disclosed in the Statement of Facts at all exonerative. To the contrary, that document described how Fugit baited two children into participating in "inappropriate sexual conversation[s]" and asked at least one a barrage of questions regarding her anatomy, underwear, and experiences, as well as whether the two of them could be naked in front of each other. Engaging young girls in the kind of discussions described above plainly involves them in "sexual activity"—that is, the "active pursuit of libidinal gratification." The idea of an adult man behaving in such a manner is utterly unpersuasive of "actual innocence," and Fugit's procedural default of his statutory claim cannot be excused on this ground.

## C.

Fugit maintains, however, that he can satisfy the second ground for excusing procedural default, cause and prejudice, by establishing ineffective assistance of counsel under the Sixth Amendment. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("Ineffective assistance of counsel . . . is cause for a procedural default."). As an initial matter, this court has agreed to consider a limited subset of Fugit's ineffective

assistance claims, and there is some question as to whether those theories are sufficiently connected to the procedural default in order to excuse it. We conclude, though, that we need not consider Fugit's ineffective assistance arguments for this purpose at all, given the above disposition of the dispute over the meaning of § 2422(b)'s "sexual activity" element. That is, because we have decided that Fugit's statutory claim fails on the merits, whether that claim is defaulted has become irrelevant.

IV.

Moreover, Fugit's ineffective assistance arguments provide no substantive grounds for relief. The Supreme Court has made clear that ineffective assistance challenges brought under the aegis of § 2255 are not themselves susceptible to procedural default. *Massaro v. United States*, 538 U.S. 500, 503-04 (2003). We do not think, however, that Fugit's ineffective assistance claims provide any independent basis for overturning his conviction on Count Two.

The framework governing this analysis is familiar. In order to establish ineffective assistance under the Sixth Amendment, a person must show (1) that his attorney's performance "fell below an objective standard of reasonableness" and (2) that he experienced prejudice as a result, meaning that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). A different inquiry is necessary with respect to the prejudice prong, however, where a conviction is based upon a guilty plea. In that situation, a person must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In discussing "the importance of protecting the finality of convictions obtained through guilty pleas," the Supreme Court recently declared that "[s]urmounting *Strickland*'s high bar is

never an easy task." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1484-85 (2010).

### A.

As for *Strickland*'s first prong, Fugit argues that his counsel's advice to plead guilty to Count Two constituted deficient performance for two reasons. First, Fugit contends that his attorney failed to inform him of a critical defense—specifically, the argument that § 2422(b)'s "sexual activity" element includes an interpersonal physical contact requirement. Given our rejection of this defense above, we find that the performance of Fugit's attorney did not fall below an objective standard of reasonableness on this ground. Just as "[i]t is certainly reasonable for counsel not to raise unmeritorious claims," *Truesdale v. Moore*, 142 F.3d 749, 756 (4th Cir. 1998), it is equally reasonable for counsel not to advise clients of unmeritorious defenses.

Next, Fugit argues that his attorney performed deficiently by imparting erroneous advice regarding the plea process and its consequences. Specifically, Fugit contends that his attorney incorrectly informed him that he could not enter a "split plea" of guilty to Count One and not guilty to Count Two because both counts were presented in the same indictment. Fugit also contends that his attorney told him that if he pleaded guilty to both counts, his sentences would run concurrently (again because both counts were contained in a single indictment), whereas, in actuality, the sentencing court retained discretion to select either concurrent or consecutive sentences and, in fact, ordered the latter. While any such advice would have been erroneous, Fugit nonetheless fails to satisfy the prejudice prong of the *Lockhart* inquiry.

### B.

As outlined above, in order to prove prejudice in the guilty plea context, a person challenging his conviction must estab-

lish "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59. The Supreme Court has specified, furthermore, that such an individual "must convince the court" that such a decision "would have been rational under the circumstances." *Padilla*, 130 S. Ct. at 1485. The challenger's subjective preferences, therefore, are not dispositive; what matters is whether proceeding to trial would have been objectively reasonable in light of all of the facts. *See Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) ("The test is objective, not subjective . . . .").

Fugit falls far short of satisfying this standard. He insists that "the record is . . . clear" that he "would not have pleaded guilty to Count Two but for trial counsel's erroneous advice." Even if this statement is subjectively true, however, the decision to go to trial would not have been objectively reasonable for the reasons discussed above. The evidence on Count Two was overwhelming. Fugit conceded to contacting a young girl over both the internet and telephone, lulling her into a false sense of security by lying about his identity, asking her a sustained series of totally inappropriate questions, and making numerous patently lewd comments—including soliciting her to undress and to masturbate. What is more, had Fugit proceeded to trial, he would have undoubtedly opened himself up to multiple additional charges relating to multiple other victims and to child pornography as well.

Fugit, in other words, was lucky to receive the deal that he did. Pleading guilty generally involves a conscious decision to accept both the benefits and burdens of a bargain. That decision may not be lightly undone by buyer's remorse on the part of one who has reaped advantage from the purchase. Fugit, consequently, cannot show that declining to plead guilty "would have been rational under the circumstances," *Padilla*, 130 S. Ct. at 1485, and his remaining ineffective assistance arguments thus fail for lack of prejudice. *See Pilla*, 668 F.3d at 373 (finding that proceeding to trial would have been irra-

tional where defendant "faced overwhelming evidence of her guilt" and "had no rational defense, would have been convicted and would have faced a longer term of incarceration").

## V.

There are cases where the most learned doctrines of law match the most untutored lessons of common experience. This is one of those. There is no innocence here, save that of the child victims. Collateral review has nothing to correct.

The judgment is affirmed.

*AFFIRMED*