ANN WALSH BRADLEY, J.
¶ 80 (dissenting). In Padilla v. Kentucky, 559 U.S. 356, 360 (2010), the United States Supreme Court determined that defense counsel should have informed his client "that his conviction for drug distribution made him subject to automatic deportation," and that counsel's failure to do so constituted deficient performance.
¶ 81. This case involves the same type of crime and the same immigration statute at issue in Padilla. It should have the same result.
*109 ¶ 82. Yet, rather than employing a straightforward application of Padilla, the majority conducts a lengthy analysis, making several missteps along the way. I focus here on two errors of substantial consequence.
¶ 83. First, the majority lowers the professional standard for Wisconsin attorneys below that required by national standards and the United States Supreme Court. It contends that when a client is concerned about immigration consequences of a plea, his attorney need not even look at the statute governing the immigration consequences before providing advice. It states: "we D disagree with Shata's argument that Attorney Toran performed deficiently by not reading the relevant immigration statutes." Majority op., ¶ 75.
¶ 84. Second, in maintaining that an attorney provides effective assistance by advising a client with the same language that a court uses in a plea colloquy, the majority misunderstands Padilla's holding and conflates the court's obligations under the Fifth Amendment with the obligations of an attorney under the Sixth Amendment.
¶ 85. Together these errors severely undermine the standards for attorney conduct set forth in Padilla. The probable result is that clients will be left with only vague and incomplete advice about the immigration consequences of entering a plea. Because I am confident that clients deserve more and recognize that Wisconsin attorneys must do better, I respectfully dissent.
I
¶ 86. The majority's position that an attorney need not even look at the statute governing the immigration consequences at issue before providing advice *110 is untenable. Despite defense counsel's awareness that Shata was "very concerned" about deportation, the majority "disagree[s] with Shata's argument that Attorney Toran performed deficiently by not reading the relevant immigration statutes." Majority op., ¶ 75.
¶ 87. An attorney's failure to read the statute governing the immigration consequences of a plea after his client has indicated that deportation is a great concern is a quintessential example of deficient performance. As the United States Supreme Court has explained, "an attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).
¶ 88. Strickland v. Washington provides that in determining whether an attorney's performance is deficient, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. 668, 688 (1984). The standard of conduct set by the majority is neither prevailing nor a recognized professional norm.
¶ 89. The United States Supreme Court sets the standard for performance: it requires an attorney to be familiar with the governing immigration statute before determining how to advise a client.
¶ 90. In discussing the same statute at issue in this case, the Padilla Court observed that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequences for Padilla's conviction." Padilla, 559 U.S. at 368. It stated that "Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute." Id. Given *111 the clarity of the law, the Court determined that the alleged failure of Padilla's attorney to correctly inform him of the immigration consequences of a plea was deficient performance. Id. at 369. In essence, an attorney must read the statute and convey the information it contains to the client.
¶ 91. National standards for attorney conduct likewise support the need for attorneys to investigate the governing immigration law before providing immigration advice.
¶ 92. An examination of deficient performance "is necessarily linked to the practice and expectations of the legal community." Padilla, 559 U.S. at 366. Accordingly, "prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." Id. (quoting Strickland, 466 U.S. at 688).
¶ 93. Standard 4-6.3 of the American Bar Association's Standards for Criminal Justice, Prosecution and Defense Functions (4th ed. 2015), states that "[d]efense counsel should investigate and be knowledgeable about sentencing procedures, law, and alternatives, collateral consequences and likely outcomes, . . . and advise the client on these topics before permitting the client to enter a negotiated disposition."
¶ 94. Likewise, standard 14-3.2 of the American Bar Association's Standards for Criminal Justice, Pleas of Guilty (3d ed. 1999), requires attorneys to investigate the law before advising defendants about pleas. The commentary advises that "defense counsel should be active, rather than passive, taking the initiative to learn about rules in this area rather than waiting for questions from the defendant." Id. at 126-27. Because the immigration consequence of a guilty plea may well be a client's greatest priority, *112 "counsel should be familiar with the basic immigration consequences that flow from different types of guilty pleas, and should keep this in mind in investigating law and fact and advising the client." Id. at 127.
¶ 95. The performance standard set by the United States Supreme Court and the national standards convey the same message: before advising a non-citizen client on whether to accept a plea, attorneys must investigate the immigration law implicated by the plea. The most basic investigation is to read the governing immigration statute.
¶ 96. By suggesting that an attorney need not look at and be familiar with the specific governing statute, the majority's standard fails the Strickland test. It is simply unrecognizable as a "prevailing professional norm." Padilla, 559 U.S. at 366.
¶ 97. Nevertheless, the majority transforms what would be deficient performance elsewhere into acceptable professional conduct here. It puts its stamp of approval on the conduct of Wisconsin attorneys who give substandard legal advice. This is especially troublesome in an area of law that has such significant and life altering consequences for their clients and the clients' families.
II
¶ 98. A cornerstone of the majority's analysis rests on its erroneous contention that attorneys provide effective assistance when they advise clients with the same language that a court uses in a plea colloquy. It states: "[t]he Padilla Court suggested that an attorney would give reasonably competent advice by providing a warning similar to the one that Wis. Stat. § 971.08 requires a circuit court to give: that an alien's *113 conviction may result in deportation." Majority op., ¶ 65 (emphasis in original).
¶ 99. This analysis reveals both a serious misunderstanding of Padilla's holding and conflates the court's obligations under the Fifth Amendment with the obligations of an attorney under the Sixth Amendment. I address each in turn.
A
¶ 100. Padilla addressed the same type of crime at issue in this case and its holding clearly stated what advice should have been given to Shata. However, the majority appears to misunderstand the holding.
¶ 101. Padilla instructs: "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." 559 U.S. at 360. It explained that "[t]his is not a hard case in which to find deficiency: the consequences of Padilla's plea could easily be determined from reading the removal statute." Id. at 368-69. The Court described the governing immigration statute as "succinct, clear, and explicit in defining the removal consequences [of a controlled substances conviction]." Id. at 368.
¶ 102. Padilla set forth a test for determining the amount of advice a defense attorney needs to provide. When the immigration consequences are clear, as here, the consequences must be clearly conveyed to the client, and when they are not, more general advice is sufficient:
When the law is not succinct and straightforward ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. .. . *114 when the deportation consequence is truly clear,. . . the duty to give correct advice is equally clear.
Id. Because Padilla conclusively established that the immigration consequences of a controlled substances offense are clear, Shata should have been given more than general advice.[1]
¶ 103. Yet, the language in Wis. Stat. § 971.08 that the majority deems sufficient provides only general, equivocal information:
If you are not a citizen of the United States of America, you are advised that a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country or the denial of naturalization, under federal law.
Wis. Stat. § 971.08. This warning is equivalent to the warning that Padilla permits when the law is not clear. The majority's suggestion that this warning necessarily fulfills an attorney's Padilla obligations ignores the Court's directive that such a warning is unacceptable when more specific advice is available, and ignores Padilla's determination that more specific advice is available when the defendant pleads to a controlled substances crime.
*115 ¶ 104. In an attempt to explain why it does not follow Padilla, the majority insists that this case is different because unlike Padilla's attorney, Shata's attorney did not provide incorrect advice. Majority op., ¶ 58. This distinction reveals a further misunderstanding of Padilla's holding. Padilla directly stated that its holding was not limited to affirmative misadvice from counsel. 559 U.S. at 370. It explained that a contrary holding would lead to "absurd results": "First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. . . . Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available." Id. at 370-71. The majority's disregard for the warning required by Padilla in favor of a general warning in a plea colloquy illustrates its misunderstanding of that case.
B
¶ 105. Additionally, the majority's suggestion that the court's warning pursuant to Wis. Stat. § 971.08 should be the same as an attorney's advice during plea negotiations conflates the distinct roles served by attorneys and the courts.
¶ 106. The majority repeatedly asserts that attorneys' immigration warnings should match the court's colloquy. For example, in response to Shata's argument that his attorney should have provided more information, the majority states, "if Shata's position were correct, then an alien defendant would receive inconsistent immigration warnings when pleading guilty or no contest." Majority op., ¶ 67. The majority even suggests that if an attorney were to offer more advice, the court would have to as well: it states "[if *116 Shata was correct then] the circuit court should have told [Shata] that he absolutely would be deported upon conviction .... Shata's argument is inconsistent with § 971.08." Id.
¶ 107. The majority's insistence that the court and a defense attorney give matching warnings fails to recognize that they undertake different roles in relation to a defendant's choice to enter a plea. Defense counsel's role, as dictated by the Sixth Amendment, is to assist the defendant in deciding whether to enter the plea. Padilla, 559 U.S. at 370 (referring to "the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement").
¶ 108. The court plays a more limited role under the Fifth Amendment of ensuring that the plea is knowing, intelligent and voluntary. See Danielle M. Lang, Padilla v. Kentucky: The Effect of Plea Colloquy Warnings on Defendants' Ability to Bring Successful Padilla Claims, 121 Yale L. J. 944, 954 (2012). As the United States Supreme Court has explained, a judge "cannot investigate the facts, advise and direct the defense, or participate in those necessary conferences between counsel and accused which sometimes partake of the inviolable character of the confessional." Powell v. Alabama, 287 U.S. 45, 61 (1932); see also United States v. Batamula, No. 12-20630 (5th Cir. June 2, 2015) ("the Supreme Court has long contrasted the unique and critical obligations of defense counsel during the plea bargaining process with the far more limited role of a district court to ensure a minimally valid guilty plea").
¶ 109. Precedent clearly establishes that although the role of an attorney and the role of a court overlap, they are not equivalent:
*117 A district court's duty to ensure a knowing and voluntary plea arises from the Fifth Amendment's guarantee of due process and thus affords defendants a right distinct from the Sixth Amendment right to effective assistance of counsel. While we have recognized the inter-relationship between the two amendments in the context of guilty pleas, we have never suggested that the sufficient protection of one right automatically corrects any constitutional deficiency of the other.
United States v. Akinsade, 686 F.3d 248, 255 (4th Cir. 2012) (internal citations omitted); see also Lang, 121 Yale L. J. at 948 ("these two protections serve complementary but distinct functions in our constitutional structure — neither can replace the other").
¶ 110. The Supreme Court has been clear that the inquiry into whether an attorney has provided effective assistance of counsel is different from the inquiry into whether a plea is knowing, intelligent, and voluntary:
The [Padilla] Court made clear that "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." It also rejected the argument made by petitioner in this case that a knowing and voluntary plea supersedes errors by defense counsel.
Missouri v. Frye, 132 S. Ct. 1399, 1406 (2012); see also Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) ("An inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel.").
¶ 111. Consistent with that guidance, courts have declined to conclude that the generic warning in a plea colloquy rescues inadequate advice from defense attorneys. See, e.g., United States v. Kayode, 777 F.3d 719, 728 (5th Cir. 2014) ("[A] district court's admonish *118 ments are 'irrelevant' in determining whether error has occurred under the first Strickland prong."); Akinsade, 686 F.3d at 255 (finding that a trial court's general admonishment concerning immigration consequences could not cure misadvice by counsel, unless specific); Ortega-Araiza v. State, 331 P.3d 1189, 1196 (Wyo. 2014) ("We find that the district court's generic advisement could not compensate for defense counsel's failure to adequately advise his client as required by Padilla.")', Hernandez v. State, 124 So. 3d 757, 763 (Fla. 2012) ("[A]n equivocal warning from the trial court. . . cannot, by itself, remove prejudice resulting from counsel's deficiency."); State v. Sandoval, 249 P.3d 1015, 1020-21 (Wash. 2011) ("[T]he guilty plea statement warnings . . . cannot save the advice that counsel gave."); State v. Favela, 311 P.3d 1213, 1214 (N.M. Ct. App. 2013) ("judicial statements made during the plea colloquy about the immigration consequences of a plea do not cure counsel's deficient representation").
¶ 112. By suggesting that the warning in Wisconsin's plea colloquy statute is sufficient to fulfill an attorney's responsibility under Padilla, the majority ignores Padilla's holding: when the relevant immigration statute is clear, as here, "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." 559 U.S. at 360.
¶ 113. The majority's suggestion likewise rings hollow because it fails to recognize the difference between the defendants' Fifth and Sixth Amendment rights. It conflates the role of an attorney with the role of the court. The infirmity of the majority's suggestion is exacerbated because it comes at a time when "the importance of accurate legal advice for noncitizens accused of crimes has never been more important." Id. at 364.
*119 III
¶ 114. In contrast to the majority, I conclude that Padilla requires more than what the defense attorney did in this case. As discussed above, under Padilla, the amount of information an attorney must provide to a non-citizen client regarding the immigration consequences of a plea is dependent upon how clear the law is:
When the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice Alito), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.
Padilla, 559 U.S. at 369.
¶ 115. Padilla explicitly held that the law setting forth the immigration consequences of a conviction relating to a controlled substance is clear: "[8 U.S.C. § 1227(a)(2)(B)(i)3 specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." Id. at 368. Given the clarity of the law, "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." Id. at 360.
¶ 116. In this case, Shata faced a charge of possession with intent to deliver marijuana, as party to a crime. The state offered to recommend a short sentence if Shata pled guilty to that crime. The plea implicated the same immigration statute that was at issue in Padilla. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of. . . any law or regulation of a *120 State, the United States, or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.").
¶ 117. Because the same statute and immigration consequences applied to Shata that applied to Padilla, Padilla's holding applies as well. "[C]onstitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." Id. at 360. Yet that is not the advice that he gave. Instead, Shata's attorney informed him only that there was a "strong chance" of deportation.[2]
¶ 118. Advising a client that there is a "strong chance" of deportation is not equivalent to advising that the client is "subject to automatic deportation." The court of appeals addressed this issue in State v. Mendez, 2014 WI App 57, 354 Wis. 2d 88, 847 N.W.2d 895. There, Mendez sought to withdraw his plea, asserting that his counsel had been deficient by failing to tell him the clear deportation consequences of a plea. At the hearing, his attorney testified that he did not tell Mendez that he would be deported, instead he basically reiterated the *121 general warning on the plea questionnaire that a conviction may make Mendez inadmissible or deport-able. Id., ¶ 4.
¶ 119. In response to Mendez' motion, the State cited Chacon v. State, 409 S.W.3d 529 (Mo. Ct. App. 2013) (as it does here). Id., ¶ 13. In Chacon, the Missouri court of appeals determined that an attorney's advice to a client that he "would very likely be deported and wouldn't be able to come back" was sufficient. After observing Chacon's holding, the Wisconsin Court of Appeals stated explicitly: "We reject Chacon. Its holding is contrary to Padilla's plain statement that 'when the deportation consequence is truly clear . .. the duty to give correct advice is equally clear.'" Id., ¶ 14 (quoting Padilla, 559 U.S. at 369). In other words, informing a client that deportation is "very likely" is not good enough when deportation is presumptively mandatory.
¶ 120. I agree with the Mendez court that advising "deportation is very likely" is not the same as advising "deportation is presumptively mandatory." It does not convey the same degree of certainty. Like the advice given in Mendez and Padilla, the advice given to Shata did not meet the prevailing professional norm and constituted deficient performance.
¶ 121. I turn next to the second part of the Strickland test: whether that deficiency prejudiced Shata. 466 U.S. 668. In this case, the circuit court determined that there was no prejudice as a result of the advice that Shata received. It explained "I don't find Mr. Shata's testimony to be credible today that he would've gone to trial under any circumstance had he known that removal, deportation was a presumptive mandatory."
*122 ¶ 122. The circuit court's analysis of prejudice misses the mark. The test for prejudice when an attorney fails to advise a client about immigration consequences is distinct from other scenarios. It is not whether the defendant would have gone to trial had the defendant received the adequate advice. Rather, the test "in determining whether deficient counsel prejudiced a noncitizen defendant's plea deal is whether 'a decision to reject the plea bargain would have been rational under the circumstances.'" Mendez, 354 Wis. 2d 88, ¶ 12 (quoting Padilla, 559 U.S. at 372).
¶ 123. This test recognizes that the ability to remain in the United States may be more important to a defendant than the length of a potential sentence. The desire to avoid deportation can dramatically affect a rational noncitizen's decision to accept or reject a plea offer.
¶ 124. Therefore, under Padilla's test, a defendant can show prejudice by establishing that it would have been rational to reject a plea offer in hopes of obtaining a different plea offer that would not result in deportation, even if doing so exposes him to a longer sentence. As Mendez acknowledges, "an alien defendant might rationally be more concerned with removal than with a term of imprisonment.'" Mendez, 354 Wis. 2d 88, ¶ 16 (quoting United States v. Orocio, 645 F.3d 630, 643 (3d Cir. 2011), abrogated in part on other grounds by Chaidez v. United States, 133 S. Ct. 1103 (2013)). Such a defendant might rationally choose to risk a lengthier prison sentence in exchange for another plea offer to an amended charge that does not carry automatic deportation consequences. Indeed, "[i]n numerous post -Padilla cases, courts have concluded that despite the benefit of a great reduction in the length of the potential prison sentence, a rational noncitizen defendant might have *123 rejected a plea bargain and risked trial for the chance of avoiding deportation." Mendez, 354 Wis. 2d 88, ¶ 16.
¶ 125. An objective standard is applied to the determination of whether it would be rational to reject a plea bargain. See Bonney v. Wilson, 754 F.3d 872, 884 (10th Cir. 2014); United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012); Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012); Zemene v. Clarke, 768 S.E.2d 684, 692 (Va. 2015).
¶ 126. Here, in addition to failing to consider whether a decision to reject the plea bargain would have been rational, the circuit court's discussion of what it thought Shata would have done reveals that it took a subjective approach to the prejudice analysis. Accordingly, the court erred in both employing the wrong test and in applying a subjective standard.
¶ 127. Under the objective standard we consider the totality of the circumstances. In its brief prejudice analysis, however, the circuit court focused solely on the risk Shata would have faced had he gone to trial: "the risk [Shata] ran had this matter gone to trial and more adverse facts came out, that the Court wasn't necessarily aware of at the time of sentencing, the sentence could've been much longer and a more significant period of incarceration or imprisonment which may ultimately reflect upon a presumptive mandatory removal."[3] A prejudice analysis should not be so limited.
*124 ¶ 128. Mendez stressed that a defendant facing potential deportation may show that his decision to reject a plea offer would have been rational without showing that he would likely have succeeded at trial. It provides guidance by listing factors to consider in assessing the totality of the circumstances. In determining prejudice, the court must consider the length of time a defendant has lived in the United States in comparison to the length of time lived in another country, whether he has married a United States citizen and has a child here, and whether he has a reason to fear harm upon returning to his country:
Mendez has lived in the United States since he was fourteen years old, longer than he ever lived in Mexico, and is married to a United States citizen here with whom he has a young child — also a United States citizen. He also asserted at the hearing that he fears retribution by his codefendant's family should he be deported to Mexico. Under Padilla, a court's analysis of prejudice must take those factors into account in measuring whether, properly informed of the automatic, irreversible, and permanent deportation consequences of his plea, Mendez might rationally have rejected the plea bargain in favor of trial despite the risk of four and one-half years of initial confinement.
Mendez, 354 Wis. 2d 88, ¶ 12.
¶ 129. Here, the circuit court applied the wrong test and failed to consider circumstances relevant to a prejudice determination. Given this failure, a remand to the circuit court for further proceedings on the issue of prejudice is required.
IV
¶ 130. In sum, the majority erroneously holds that attorneys need not even look at the statute *125 governing the applicable immigration consequence and that attorneys need not give any more advice than that contained in a plea colloquy. These holdings defy precedent.
¶ 131. The Padilla court well understood that effective assistance of counsel during the plea stage is critical. Padilla, 599 U.S. 356; see also Frye, 132 S. Ct. at 1406; Hill v. Lockhart, 474 U.S. 52 (1985). It emphasized that accurate legal advice about deportation consequences has never been more important and that it often is the most critical consideration for noncitizens:
The importance of accurate legal advice for noncitizens accused of crimes has never been more important.. . . [D]eportation is an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.
Padilla, 559 U.S. at 364.
¶ 132. For the reasons discussed above, I conclude that Shata's attorney's performance was deficient. Because the circuit court failed to employ the proper test and apply the correct standard for prejudice caused by inadequate immigration advice during the plea stage of trial, the correct course of action is to remand to the circuit court for further proceedings to address the issue of prejudice.
¶ 133. Accordingly, I respectfully dissent.
¶ 134. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 In this case the circuit court made a finding of fact that Shata's attorney told him that "there was a strong likelihood that he would be deported." This appears to be an error. Areview of the record reveals that the attorney never used those words. At the plea hearing he told the judge he had informed Shata "that there's a potential he could be deported." Likewise, on direct examination at the Machner hearing, the attorney stated that he did not use the word "mandatory" in informing Shata of the deportation consequences; the word he used was "potential." Then, on cross-examination, the attorney revised his statement: "I advised him prior to the plea that he may be deported, that there's a strong chance that he could be deported." Neither the attorney nor Shata ever testified that the attorney used the phrase "strong likelihood."

 The circuit court's suggestion that the length of incarceration would have affected whether removal was presumptively mandatory was also in error. Although the length of incarceration is a factor for determining deportation based on general crimes, it is not a factor in determining whether an individual is deportable for having committed a crime relating to a controlled substance. See 8 U.S.C. § 1227(a)(2)(B)(i).