**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-7333

GREGORY BRENT CHRISTIAN,

            Petitioner - Appellant,

      v.

DAVID BALLARD,

            Respondent – Appellee,

      and

MARK A. BEZY, Warden, U.S. Penitentiary, Terre Haute; STATE
OF WEST VIRGINIA; DARRELL MCGRAW; TERESA WAID, Warden,
Huttonsville Correctional Center,

            Respondents.

Appeal from the United States District Court for the Southern
District of West Virginia, at Huntington.  Robert C. Chambers,
District Judge.  (3:05-cv-00879)

Argued: December 9, 2014          Decided:  July 8, 2015

Before TRAXLER, Chief Judge, and GREGORY and AGEE, Circuit
Judges.

Affirmed by published opinion.  Chief Judge Traxler wrote the
majority opinion, in which Judge Agee joined.  Judge Gregory
wrote a separate dissenting opinion.

**ARGUED:** Matthew Nis Leerberg, SMITH MOORE LEATHERWOOD, LLP, Raleigh, North Carolina, for Appellant. Elbert Lin, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee. **ON BRIEF:** Patrick Morrisey, Attorney General, Christopher S. Dodrill, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee.

TRAXLER, Chief Judge:

In September 2003, petitioner Gregory Brent Christian ("Christian") pled guilty in West Virginia state court to two counts of first-degree armed robbery, and to one count of malicious assault arising out of his shooting of a police officer who was investigating the robberies. Pursuant to a plea agreement, Christian was sentenced to concurrent terms of 25 years imprisonment on the robbery counts, and to a consecutive term of 3-15 years imprisonment on the malicious assault count. In addition, the plea agreement allowed Christian to transfer immediately into federal custody and to serve his state sentences consecutively to the 5-year federal prison sentence that he had received for possession of a destructive device and possession of a firearm by a convicted felon.

In state post-conviction proceedings, Christian asserted that he was innocent of the armed robberies and that, while he did shoot at the police officer, the officer had instead been shot by another officer at the scene. Among other things, Christian claimed that his trial counsel failed to investigate the crimes and prepare for trial, that the prosecutor withheld exculpatory evidence, and that his guilty plea was involuntarily coerced by counsel, the prosecutor, and the conditions of the state court jail. Following an evidentiary hearing, the state court denied relief.

3

Christian next petitioned the district court for federal habeas relief under 28 U.S.C. § 2254. The district court denied relief but granted a certificate of appealability on the issue of whether trial counsel had rendered ineffective assistance in advising Christian regarding the applicability of the West Virginia recidivist statute. Because Christian has failed to demonstrate that the West Virginia state court's rejection of this claim resulted from an unreasonable factual or legal determination, based upon the conflicting evidence presented to it, we affirm.

I.

During the late evening and early morning hours of June 3 and 4, 2002, a Pizza Hut restaurant and a Marathon gas station, located in Huntington, West Virginia, were robbed at gunpoint. Officer Joe Combs and two other police officers responded to the robberies and were advised that the suspects might be at the apartment of Tammy Maynard. A car matching the description of the suspect vehicle was parked in front of Maynard's apartment. When the officers knocked on Maynard's door, she assured them that no one was inside and allowed them to enter. As the officers entered the apartment, however, Christian, who was hiding in the shadows of the hallway, began shooting at them. Officer Combs suffered a gunshot wound to the chest. Following an exchange of gunfire, Christian surrendered.

4

Gerald Henderson, a public defender, was appointed to represent Christian. Christian admitted to the police that he shot Officer Combs, but claimed that he thought he was shooting at "a black drug dealer that [he had] just robbed." J.A. 383. Christian admitted to Henderson "in their initial interview that [he] had committed the robberies." J.A. 255.

Henderson reviewed the discovery provided by the state, including pictures, an FBI report, Christian's taped statement, and the statements of the police officers. He also participated in several preliminary hearings. Among other incriminating evidence were the statements of Richard Adams, who was also in Maynard's residence when Officer Combs was shot, and those of Maynard. Adams confessed to the two armed robberies and identified Christian as his accomplice. Maynard received money from one of the robberies and believed that Christian knew he was shooting at a police officer. At least one robbery eyewitness identified Christian from a photo line-up. Although Christian did not specifically confess to the police that he robbed the Marathon or Pizza Hut, one of the police officers stated that Christian later admitted that he "figured it was the police [coming into the apartment] because [he] had just robbed a place." J.A. 374 (emphasis added).

A.

Christian and Adams were subsequently indicted in the Circuit Court of Cabell County, West Virginia, for two counts of first-degree robbery involving the use of a firearm (Counts I and II). See W. Va. Code § 61-2-12(a)(1). Christian was also indicted for malicious assault on a police officer (Count III). See W. Va. Code § 61-2-10b(b). In a separate federal indictment, Christian was charged with possession of a Molotov Cocktail, in violation of 26 U.S.C. §§ 5861(d), 5845, and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

Under West Virginia law, first-degree armed robbery is punishable by a determinate term of imprisonment of not less than ten years, but "which may be any number of years from ten to life." State ex rel. Faircloth v. Catlett, 267 S.E.2d 736, 737 (W. Va. 1980); see W. Va. Code § 61-2-12(a)(1). Henderson testified that the maximum penalty that had been upheld by the West Virginia Supreme Court "was 231 years on one count of armed robbery" and that "the last three trials here on armed robbery each individual got between 60 and 80 years." J.A. 450. Malicious assault of a police officer is punishable by an indeterminate term of imprisonment of "not less than three nor more than fifteen years." W. Va. Code § 61-2-10b(b). Good-time credits allow a prisoner the opportunity to cut his total

6

sentence in half, but are not applicable to a life sentence. See W. Va. Code § 28-5-27(c), (d).[1]

Under West Virginia's recidivist statute, a defendant convicted of a second felony offense will have five years added to his determinate sentence. See W. Va. Code § 61-11-18(a). If the court imposes an indeterminate sentence, the minimum term is doubled. See id. A defendant convicted of a third felony offense shall be sentenced to life in prison, without eligibility for parole for 15 years. See W. Va. Code §§ 61-11-18(c), 62-12-13(c). The prosecuting attorney must give information of prior felony offenses to the trial court "immediately upon conviction and before sentence." W. Va. Code § 61-11-19. A separate recidivist proceeding is then held, in which a factual determination must be made, either by admission or by jury, that the defendant is the same person. See id.

As relevant to his sentencing in this case, Christian had two qualifying felony convictions. However, because these prior convictions were returned on the same day, they would only have

---

[1] "[F]or good conduct in accordance with" West Virginia's state statute, inmates "shall be granted one day good time for each day he or she is incarcerated, including any and all days in jail awaiting sentence which are credited by the sentencing court to his or her sentence." W. Va. Code § 28-5-27(a), (c). The good-time credits are "deducted from the maximum term of indeterminate sentences or from the fixed term of determinate sentences." W. Va. Code § 28-5-27(b).

counted as a single felony for purposes of the recidivist statute. See State ex rel. Hill v. Boles, 143 S.E.2d 467, 468 (W. Va. 1965).[2] Thus, Christian had one strike against him and, if convicted of the 2002 state charges, he was subject to a recidivist information that could have raised his minimum determinate sentence for one robbery to 15 years, and his minimum indeterminate sentence for the malicious assault to 6-15 years.

B.

In order to properly evaluate whether Christian's trial counsel rendered deficient advice regarding Christian's exposure to an enhanced sentence under the West Virginia recidivist statute, it is necessary to recount in some detail the circumstances of counsel's representation and the plea negotiations that took place.

As noted above, Christian admitted to Henderson in their initial interview that he committed the armed robberies, for which he faced unlimited determinate state prison sentences from

---

[2] Christian was convicted in March 1990 of burglary and of grand larceny, in violation of W. Va. Code § 61-3-11 and § 61-3-13, respectively. Christian had also pled guilty to an additional grand larceny charge in September 1988. All three convictions were included as prior felonies in the federal indictment. However, the district court below determined that Christian had been granted state habeas relief from his 1988 conviction and could find no indication that he was retried on that charge.

8

10 years to life imprisonment, and that he shot Officer Combs, for which he faced a 3-15 year indeterminate prison sentence, without regard to any recidivist exposure. In addition, Christian was facing federal prison sentences for his destructive device and firearm charges. Christian "directed [Henderson] to engage in plea negotiations from the onset of counsel's representation," J.A. 255, and this was done in cooperation with his federal public defender ("FPD").

As early as December 2002, Christian was willing to accept a 25-year sentence for both robberies, plus the 3-15 year sentence for the malicious assault, provided the time he received for the robberies was "concurrent with any time he receive[d] on his pending Federal charges." J.A. 594. Christian "suffers from Hepatitis C and substantial liver damage," id., and he wanted to serve as much of his time as possible in the federal penitentiary, where he felt the conditions were better. At the time, Christian's FPD expected Christian's federal sentence to be 188 months. Under this circumstance, Christian would be able to serve most if not all of his state sentence on the robbery charges in federal prison (with application of the state good time credits), leaving him to serve only the 3-15 years on the malicious assault charge in state prison. Christian would also be eligible for parole from the malicious assault conviction in three years, once he began

9

serving that sentence, although counsel acknowledged that there was a good chance that Christian would not survive that long in light of his poor health.

The state prosecutor was willing to consider Christian's proposal if Christian supplied proof of his medical problems, but he would not agree to a concurrent sentencing recommendation until Christian actually received his federal sentence. Christian's FPD also advised Christian that the federal charges would have to be resolved first to achieve a concurrent sentence with the state charges, and he "agreed to pay for a physician to examine Mr. Christian and report on his current condition and life expectancy." J.A. 594.

Christian pled guilty to the federal charges on February 11, 2003. On May 27, 2003, however, he was unexpectedly sentenced to a term of only 63 months in federal prison, with a recommendation that he be medically evaluated for Hepatitis C and any other serious medical conditions. Plea negotiations continued on the state charges, but it was clear that Christian would not be able to serve the bulk of his expected state time in federal prison as he had hoped.

On July 23, 2003, Henderson advised the prosecutor that Christian was willing to plead guilty to the malicious assault count only, provided the 3-15 year sentence ran concurrently with his federal sentence. This proposal would have allowed

10

Christian to serve out the bulk of his state sentence on this single count in federal prison first, and it appears that Henderson and Christian agreed that it would be best to sever the officer-shooting charge from the armed robberies, due to its high-profile nature.

The state prosecutor responded with a plea offer of 40 years on the robberies, concurrent with the federal sentence, plus the consecutive 3-15 years on the malicious assault. Christian countered with a request for 30 years on the robberies instead. No mention was made during these negotiations of Christian's exposure to a recidivist proceeding or sentence.

On August 29, 2003, Christian agreed to the terms of the final plea agreement with the state. Under the agreement, the prosecutor would recommend a 25-year sentence for each robbery, to be served concurrently with each other and with credit for the time Christian had already served in the Cabell County jail, plus 3-15 years for the shooting of Officer Combs, all to be served after Christian exhausted his 5-year federal sentence. The prosecutor also agreed to a number of specific conditions that Christian had requested:

> (1) Christian's time served in the Cabell County Jail would be applied to the first-degree robbery sentences, and the malicious assault sentence would be served consecutive to it;

11

(2) Christian would be allowed to waive the presentence investigation and be immediately sentenced on his plea date;

(3) The prosecutor and defense counsel would "state on the record that [they] both waive this right and that it is clearly [Christian's] desire and in his best interests to be returned immediately to Federal custody;"

(4) The prosecutor would immediately "call the Federal Marshall . . . and make the necessary arrangements" to transfer custody;

(5) There would "be absolutely no mention[] . . . of Mr. Christian's Hepatitis C condition" by "anyone associated with th[e] case;"

(6) The prosecutor would take steps to have all of the court costs waived, in the pending case and any others involving Christian, so that Christian "at least could apply for a driver's license" if released; and

(7) There would "BE NO RECIDIVIST" filed against Christian after he pled guilty.

J.A. 597, 267. Under this arrangement, Christian would still be able to serve his 5-year federal sentence first, and there would be no delay in his ability to be immediately transferred to federal custody. Upon his release from federal prison, Christian would be eligible for parole from his state sentence in approximately 11 years. If parole were denied, Christian would be able to exhaust his entire state sentence in approximately 19 years. Christian was 32 years old at the time.

C.

On September 2, 2003, Christian arrived in state court to enter his guilty plea. At the beginning of the plea hearing,

12

however, the trial court conveyed its understanding that Christian had decided to enter a partial plea instead of the full plea. Counsel then informed the court that Christian "[ha]s changed his mind and has rethought it and he's decided it's the best thing just to go through with the original plea." J.A. 265.

In the plea questionnaire, Christian confirmed that he understood the minimum penalty ("10 years") and maximum penalty ("unlimited") for each robbery charge, as well as the mandatory 3-15 year penalty for the officer shooting. J.A. 605. Christian denied having "me[t] at any time with the prosecutor . . . concerning [his] plea of guilty when [his] counsel was not present." J.A. 606. Christian further represented that he was "satisfied with the representation [he] received from [his] lawyer." J.A. 268.

Christian admitted on the record: "I robbed a Marathon station and a Pizza Hut restaurant" with a firearm, J.A. 269, and "I shot the police officer with the firearm," J.A. 270. The trial court then explained to Christian the potential recidivist consequences if he were to go through with the current plea and commit a third felony in the future:

> Q: Do you understand that under [West Virginia's] three strikes law, these will count as another strike against you, and that in the future if you're found guilty or plead guilty to any felonies, the fact that these are on your record could be used to increase

13

> your penalties, and in your case, could give you life in prison <u>because it would be strike three</u>.
>
> A:    Yes, sir.

J.A. 270 (emphasis added).

When given an opportunity to speak in support of his request, Christian made the following additional representation:

> I would just like to apologize to the police officer for what happened that morning.  I did a drug that I've never done before in my lifetime.  I did some crack cocaine and my life just changed just like that.  It's a powerful drug.  I mean, it's a horrible drug.  There's – I don't use that as no excuse.  I mean, I accept the responsibility for what's happened.  But I never done a drug like that before, and just all of a sudden I do this drug and out of money and I go rob a store and . . . rob a Pizza Hut.

J.A. 274.  Henderson told the court that Christian had also written a letter to Officer Combs apologizing for these "very serious and very horrible crimes," and that they were "very fortunate" that Officer Combs was present to speak to the court. J.A. 275.  Officer Combs described his investigation and the shooting incident, and essentially spoke in support of Christian's sentencing request.  He confirmed that Christian had apologized to him, and also added that Christian had told him that "he wanted to get involved in a restitution program . . . in prison."  J.A. 277.  Officer Combs told Christian, "What I'll take from you is the time the Judge is going to sentence you to.  I'll take that.  And hopefully you can do something productive with that time."  J.A. 277.

14

At the conclusion of the hearing, the court sentenced Christian in accordance with the recommended plea agreement, and Christian was transferred into federal custody the following day, as promised. He did not appeal.

## II.

Nearly four years later, in July of 2007, Christian filed a pro se habeas petition in the state circuit court seeking relief from his state court convictions.[3] In his petition, Christian refuted virtually every factual representation that he made at his guilty plea hearing. He claimed that he was actually innocent of the crimes and had been coerced into pleading guilty by his counsel, the prosecutor, and the conditions of his confinement in the Cabell County Jail. With regard to the armed robberies, Christian claimed "that his identity was mistaken for someone else and that the co-defendant, Richard Adams, wrongfully accused [him of being his accomplice] in exchange for the police ending a possible homicide investigation against Mr. Adams." J.A. 243. With regard to the shooting of Officer Combs, Christian claimed that Officer Combs did not announce himself at the apartment and that he thought he was shooting at an intruder (but not, as he admitted having told the police

_____

[3] Between 2003 and 2007, Christian filed three petitions for a writ of habeas corpus in the original jurisdiction of the state supreme court, which were summarily refused.

15

earlier, a drug dealer that he had just robbed). In addition, Christian claimed that the ballistics report would have shown that Officer Combs was likely shot by his own partner and not by Christian.

A.

The majority of Christian's habeas claims fell into three categories. First, Christian alleged that his Sixth Amendment right to effective assistance of counsel was violated in seven separate respects, all revolving around his claim that counsel ignored his claims of innocence, refused to prepare for trial, refused to file motions on his behalf, and "pressured [him] into pleading guilty rather than honoring [his] requests for a jury trial. Essentially, Christian [claimed that] his guilty plea was brought about because trial counsel only divulged to [him] the evidence that tended to prove [his] guilt rather than any evidence that may have tended to exonerate [him]." J.A. 254.

Second, Christian claimed that the prosecutor withheld favorable evidence that would have supported his claims of innocence, including the ballistics evidence that he claimed might have exonerated him from the shooting of Officer Combs. In an amended petition, Christian additionally claimed, again contrary to the representation he made at the time of his plea, that when the state prosecutor learned of Christian's last-minute decision to reject the plea agreement and to plead guilty

16

to just the malicious assault charge on the morning of his plea, the prosecutor improperly approached Christian outside the presence of his counsel about his decision. Specifically, Christian claimed:

> the state's prosecutor approached the petitioner without the presence of his counsel and stated "this is a shocker, are you sure you know what you['re] doing?". The petitioner responded "can you get my attorney?". The petitioner believes that the exchange triggered a chain reaction, which led the petitioner to plead guilty to all counts of the indictment. . . .
>
> Counsel then informed the petitioner that the prosecution would seek enhancement under the Recidivist Statute if the petitioner persisted with pleading guilty to [the single count] of the indictment. As a result of the prosecutor's position, the petitioner pled guilty to all three counts of the indictment with the prosecutor agreeing not to request that recidivist proceedings be pursued against the petitioner.

J.A. 209 (emphasis added); see also S.J.A. 12 (alleging that "the Prosecutor threatened that he would pursue recidivist proceedings against Petitioner (interpreted by Petitioner as meaning a life sentence), if he elected to plead to only count III, rather than all counts"); S.J.A. 13 (alleging "that the prosecution used the threat of recidivist proceedings to inspire Mr. Christian's guilty plea").

Finally, Christian claimed that his guilty plea was involuntarily coerced by the conditions at the Cabell County Jail. Christian alleged that he was subjected to ongoing "beatings and death threats," and that counsel ignored his

requests to file a motion for alternative confinement and "exploited [this abuse] to compel him to plead guilty." J.A. 182. According to Christian, his counsel "negotiated a plea agreement to where, upon pleading guilty to all counts, Mr. Christian would immediately be sentenced and expeditiously removed from the Cabell County Jail (from the reach of his assailants) and relocated to a federal facility," J.A. 182, and "often indicated that [Christian] could quickly escape the life threatening danger that overshadowed him at the Cabell County Jail, if he would only plead guilty to all of the charged violations," J.A. 182. Christian similarly alleged that "[o]n the [day of his plea], Counsel . . . vigorously emphasized that unless Mr. Christian pled guilty to all counts, he would not receive the plea agreement, and would therefore remain at the Cabell County Jail." J.A. 183.

Christian did not allege an ineffective-assistance-of-counsel claim based on counsel's advice as to the applicability of the recidivist statute. However, in connection with his involuntary plea claim, Christian made the following pro se allegation:

> In contrast to the ballistics laboratory report . . ., Counsel coer[c]ed Mr. Christian into believing that a jury trial would be utterly hopeless on the shooting incident. Counsel thereafter slovenly advised Mr. Christian that if he pled guilty to only the shooting incident, there would be no plea agreement, and that the Prosecution would seek a

18

> sentence in accordance with West Virginia's recidivist laws, [interpreted by Mr. Christian as meaning a mandatory life sentence]. However, after pleading guilty Mr. Christian learned that West Virginia's recidivist laws could not have lawfully applied to him.

J.A. 183 (emphasis added). After state habeas counsel was appointed to represent Christian, an amended petition was filed on his behalf. Although the amended petition refined Christian's claims that counsel was constitutionally deficient in numerous respects, it also did not allege that counsel's recidivist advice was constitutionally deficient or that, but for this advice, Christian would not have pled guilty. With regard to the involuntary plea claim, the amended petition stated as follows:

> The petitioner further avers that his lawyer coerced him into believing that a jury trial would be utterly hopeless regarding the charge of maliciously wounding a police officer. His counsel advised the petitioner that if he pled guilty to only the shooting incident there w[ould] be no plea agreement and that the prosecution would then seek a sentence under West Virginia's recidivist laws. Trial counsel made the petitioner believe that the plea agreement was in the petitioner's best interest even though the agreement required the petitioner to plead guilty to all counts of the indictment. The petitioner asserts that his lawyer emphasized that unless the petitioner pled guilty to all counts, the petitioner would then remain at the horrid conditions of Cabell County Jail.

J.A. 210. Thus, the amended petition repeated Christian's prior pro se claim that counsel "coerced him into believing" that he could not defeat the officer-shooting charge, but did not allege

19

that counsel's recidivist advice was incorrect or constitutionally deficient. Moreover, the amended petition omitted Christian's prior pro se claim that he "interpreted" counsel's statement about the prosecutor's intent as "meaning a mandatory life sentence," as well as his incorrect assertion that "West Virginia's recidivist laws could not have lawfully applied to him." J.A. 183.

B.

On November 30, 2010, the state habeas court conducted an omnibus evidentiary hearing to address Christian's claims. Both Henderson and Christian testified at the hearing and gave markedly different accounts of the events in question. Ultimately, the state court denied Christian's habeas petition in its entirety, based primarily on credibility determinations and a failure of factual proof.[4]

The bulk of Christian's testimony revolved around his claim that he was innocent, that he told counsel that he was innocent, and that he told counsel that he did not think he actually shot Officer Combs. He testified that he begged counsel to

---

[4] During state post-conviction proceedings, Christian was intermittently appointed counsel and allowed to proceed pro se, at his request. Ultimately, the state court appointed state habeas counsel to act as co-counsel with Christian at the evidentiary hearing. Under the odd arrangement, Christian's habeas counsel questioned Christian, and Christian was allowed to personally question Henderson.

20

investigate the crimes and file motions on his behalf, but that counsel refused to do so and pressured him to plead guilty instead. According to Christian:

> [counsel] would come in and tell me all the negative, you know, you've got to, you know, you're caught red-handed with a smoking gun, you've got people that identified you out of a photo lineup, you got Adams who has implicated you, you've got Sergeant Johnson who has testified to this, and he would mention things like you're going to get 100 years in prison. And quite frankly, I know as odd as this may sound, I told him that I did not care if I got 2 or 300 years, I wanted a trial.

J.A. 563; see also J.A. 548 ("I remember one time him yelling, You're going to get 100 years in prison just for one robbery like the other guy did. And . . . I looked at him and I said, I do not care if I get 300 years in prison, I want a trial.").

Christian testified that he "lied to the court" at the plea hearing and that "[w]ithin a few hours . . . of entering the plea," he regretted the decision and unsuccessfully attempted to contact counsel to see if "the judge would have allowed [him] to withdraw it." J.A. 569. He testified that he had "buyer's remorse" and felt that "it just wasn't the package [he] bargained for." J.A. 555. However, Christian admitted that it was not the state court bargain that he failed to realize, but rather the benefits of the plea to the federal charges that "didn't pan out" as he had hoped. J.A. 566. According to Christian, he felt "tricked" into pleading guilty to the federal

21

counts on the promise that his state sentence would "run with this mandatory time . . . in federal court." J.A. 558. After he pled guilty to the federal charges, however, his federal sentence "plummet[ed] down to 63 months." J.A. 559. Christian testified that, "I agreed to a plea because I thought I was facing a mandatory federal sentence, and of course later we found it was less than we thought, but at the time it was my request that [counsel] conduct . . . the investigations, file the motions and continuously prepare my case for trial, and that's just something he wasn't willing to do." J.A. 553.

In sum, while Christian did obtain the benefit of serving his federal time first, he complained that he did not get enough time in federal prison and had counted on more when he entered his guilty plea to the federal charges. And Christian thought "that it should have been only fair that that 40 years was ran concurrent being that I moved to my detriment and pled . . . to the federal counts as they had asked me to do." J.A. 560.

With regard to Christian's allegations regarding the state prosecutor's "threat" of recidivist proceedings on the morning of his plea, and counsel's alleged advice in response thereto, Christian briefly testified as follows:

> Q:  At the time you pled, did you believe you were eligible for [a] recidivist life sentence?
>
> A:  Absolutely, yes.

22

Q:     That was based on Mr. Henderson advising you of that?

A:     Absolutely.  We discussed it right there in that room.  He told me, . . . Greg, you're going to walk in that courtroom and you're going to plead guilty to malicious assault on a police officer.  You've got them two prior felonies.  He said, Hate to be the one to tell you, but what they're going to do – you're entering this guilty plea.  It wasn't a plea, I was just pleading outright.  I was just trying to get rid of that charge, that was the idea.  It wasn't a plea agreement or an arrangement.  I'm going to walk in and just plead guilty to this malicious assault, let them have that so I can go to trial on the robberies I did not commit.

       And that's when . . . he left and comes back and said, I've got some bad news.  And that's when he describes to me <u>what would happen</u> if I did just plead to the malicious assault, <u>and we had some concerns about that</u>.

       <u>Matter of fact, even with that, though, even with that I was still not going to – I still did not waiver</u>.  What happened was he left, [the prosecutor] come in there and he said, You sure you know what you're doing.  And then after that [the prosecutor] went and got Henderson and they both come back, and when they come back that's when the deal was re-brokered back into the original thing.

J.A. 553-54 (emphasis added).

Henderson had little memory of the specifics of his representation of Christian, which by that time had occurred over seven years prior, but he was able to testify in part from his case files and the plea negotiation letters.  See J.A. 391 ("I can't recall any specific conversations."); J.A. 392 ("I can't recall a specific conversation that many years ago.").

23

Henderson testified that Christian admitted his guilt from the outset, as reflected in his initial interview notes, and that Christian did not tell him that he "felt as if none of [his] rounds had struck Officer Combs." J.A. 514. He testified that Christian also instructed him to negotiate a plea deal from the outset, with the goal of allowing him to serve as much of his state time as possible in the federal penitentiary, where Christian felt the conditions were better. Henderson denied that Christian told him that he was being subjected to ongoing abuse at the hands of his jailers, and testified that he "wouldn't have told [Christian] to plead simply to escape" the "conditions of [his] confinement." J.A. 479.

Henderson was also unable to recall the events that occurred on the morning of Christian's plea hearing, nor did he even recall Christian changing his mind about the plea agreement. See J.A. 454 (testimony that "if you were thinking about changing your mind [about the plea], I would have said, Well, the judge wants to know what you want to do and either way is fine," but "I don't recall it; it was eight years ago."). Henderson likewise did not recall the specifics of any discussions about the prosecutor's intent to file a recidivist information if Christian rejected the plea agreement. Henderson testified as follows:

24

Q: Okay. Now, when I was positioned to plead guilty to just the malicious assault charge, . . . did you not . . . say to me, Greg, you have two prior felonies, that if you plead guilty to this charge then the state will implement recidivist proceedings against me?

A: I note in the letter that I made reference to recidivist, and I know you advised me you had two prior felonies. And . . . I know I put in the final offer to [the prosecutor] there will be no recidivist. But my recollection, when I asked your record, do you have any prior felonies, that you advised me you had two.

Q: Right. . . . That was in the original plea where it was presumed I would plead to all three counts the week before, there would be no recidivist filed.

A: Correct.

Q: But when we got to court and . . . I changed everything and went to enter just the malicious assault, did you advise me that, Greg, hey, if you do that, . . . the state will pursue recidivist proceedings against you . . . because you've got two prior felonies, do you recall that?

A: Yeah. Now, I would have told you, yes, if you enter a plea to a felony with no agreement that the state won't recidivist, then they have every right to file their recidivist petition.

Q: Right. And . . I ended up taking the other plea instead because if I had pled to the one count of the malicious assault with the two prior felonies, . . . the state would have moved, the way we understood it at the time, would move for a life sentence in prison; correct?

A: If you have two prior independent felonies . . ., then, yes, they can file a recidivist. And if you had told me you had two prior, I would have explained to you doing a blanket plea without an agreement, they would have that right.

25

Q:   And do you recall that?  You said, Hey, if you do that, you're going to receive, the state will pursue recidivist proceedings; correct?

A:   I don't recall what I told you, but I would have in every other case told my client if they had two priors that could be used, then the state could do a recidivist, and under West Virginia two usable priors would result in a life without eligibility for 15 years.

Q:   Okay. . . .  [A]fter that exchange, was that not when we said . . . it would not be a good move for me to plead just to one count, that I should take the whole deal and plead to the 40 years, the way it ended up happening; is that correct?

A:   No, I would have told you that pleading to one count, if you have two usable felonies, which you told me, then of course that's not in your best interest for them to give you life without eligibility if they can prove those priors. . . .  That being the case. Now, in a different situation it might be different.

Q:   . . . .  If we just entered a plea to the one count, then the state would pursue the recidivist proceedings, and you're exposing yourself to life, that's the way we understood it; correct?

A:   I . . . would have explained to you that you understand that if you enter a plea to this charge and you have two felonies, as you told me you did, that they could file a petition, and if they prove those felonies that are usable felonies under law, that you could get life without eligibility for 15 years.  I would have advised you of that.

Q:   . . . .  Are you now aware . . . those two prior felonies need to be like in . . . a separate indictment or a separate occurrence?

A:   . . . .  You can't have a guilty finding on two felonies on the same day, same time and that count as two.  That would only be one felony. . . .

Q:   Are you now aware that my two prior felonies were contained in one single indictment, that I never could have been exposed actually to a life sentence?

26

A:  I saw something in one of your pleadings, but I was unaware that there were separate at the time. When I asked you do you have a prior felony, you said you had two felonies.

J.A. 515-20 (emphasis added).

C.

The state habeas court denied Christian's petition in its entirety.  The court found that Christian told Henderson in their initial interview that he had committed the robberies and shot Officer Combs, which was supported by "[n]otes made by trial counsel contemporaneous with the interview and entered into the files of the Public Defender's office."  J.A. 255.  The state court also found that Christian "directed counsel to engage in plea negotiations from the onset of counsel's representation."  J.A. 255.  The court rejected Christian's claim that counsel's investigation was constitutionally deficient, as well as his claims that the prosecutor suppressed exculpatory evidence and engaged in prejudicial misconduct by speaking to Christian outside the presence of his counsel on the day of his plea.

The state court also rejected Christian's claim that his guilty plea was coerced by his alleged mistreatment at the Cabell County jail, noting that there were "[n]o photographs, no medical records, and no affidavits of witnesses . . . attached, nor was any evidence adduced at the hearing to support

27

[Christian's] claims of beatings and threats (other than [his own] testimony to this effect)." J.A. 247.

Finally, the state court rejected Christian's claims that he was pressured by counsel to take the plea because Christian "could not articulate any specific factor of pressure that had its origins in the words or testimony of [his state trial] counsel [and he] did not state with even a modicum of specificity any instance where counsel pressured [him] to enter into a plea." J.A. 257. The state court also found that Christian failed to "establish by a preponderance of the evidence that his trial counsel acted incompetently, . . . or that [his] guilty plea was motivated by an alleged act of counsel's incompetency." J.A. 249.

D.

Christian thereafter filed a pro se appeal from the denial of habeas relief to the Supreme Court of Appeals of West Virginia ("the West Virginia Supreme Court"). In this appeal, Christian raised for the first time an ineffective-assistance-of-counsel claim based upon trial counsel's alleged misadvice as to his recidivist exposure.

Relying primarily upon Henderson's testimony, Christian argued that he had told Henderson that he had two prior felonies, but that counsel "made no additional inquiries into the circumstances of [Christian's] prior felonies." S.J.A. 24.

Christian additionally argued that, on the day of the plea, "counsel notified [him] that the State would seek to enhance his sentence under the recidivist statute if he persisted with pleading to count-3 only," and that he "interpreted counsel's assertion as meaning 'a mandatory life sentence.'" S.J.A. 24 (emphasis added). The supreme court summarily affirmed the decision of the state circuit court.

The district court thereafter denied Christian's pro se federal habeas petition, which raised the identical claims that counsel did not inquire into the circumstances of Christian's prior felony record and that Christian "interpreted counsel's assertion as meaning 'mandatory life sentence.'" J.A. 83 (emphasis added). Before the district court, Christian additionally argued that his "counsel effectively advised him that he would receive a 'life' sentence if he persisted with only pleading to the malicious assault charge, without any reference to a 5-year enhancement under W. Va. Code § 61-11-18(a)." J.A. 709 (emphasis in original). The district court held that "it was not constitutionally deficient representation for counsel to choose not to investigate the details of Christian's prior felony convictions, and instead concentrate his efforts on negotiating a plea in which the State would not seek a recidivist enhancement." J.A. 752. However, the district court granted a certificate of appealability on the

29

limited issue of "whether counsel rendered ineffective assistance in advising Christian of the applicability of the West Virginia recidivist law to his case." J.A. 763.

## III.

Before we address the merits of Christian's Sixth Amendment recidivist-advice claim, we briefly consider the state's argument that Christian failed to exhaust this claim in state court under 28 U.S.C. § 2254(b)(1)(A) because he did not fairly present the operative facts and controlling legal principles to the state circuit court. See Anderson v. Harless, 459 U.S. 4, 6 (1982); Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004). The state admits that Christian raised the claim in his appeal to the West Virginia Supreme Court but contends that this too was insufficient because that court routinely refuses to consider grounds for habeas relief that were raised for the first time on appeal. See State ex rel. Wine v. Bordenkircher, 230 S.E.2d 747, 751 (W. Va. 1976).

While it is true that Christian did not raise a separate Sixth Amendment claim in the state circuit court based on counsel's recidivist advice, or allege there that it was counsel's recidivist advice that rendered his plea involuntary, he did present testimony about the recidivist discussions that he alleges took place on the morning of his plea. See State ex rel. Humphries v. McBride, 647 S.E.2d 798, 803 (W. Va. 2007)

30

(per curiam).  More importantly, however, the West Virginia Supreme Court stated that it had "carefully considered the merits of each of petitioner's arguments as set forth in his brief and in his reply brief" and "f[ound] no error in the denial of habeas corpus relief."  J.A. 240.  Although we understand the state's frustration with Christian's evolving allegations, we have no reason to believe that the West Virginia Supreme Court did not mean what it said.  Accordingly, we find that Christian exhausted his claim before the state court.

IV.

A.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may grant habeas relief only when a state court's adjudication of a claim on the merits "resulted in a decision" that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2); see also Harrington v. Richter, 562 U.S. 86, 100 (2011).  The AEDPA standard "serves important interests of federalism and comity" and it "is intentionally difficult to meet."  Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam) (internal quotation marks

31

omitted).  To obtain relief "from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

To prevail on his Sixth Amendment claim of ineffective assistance of counsel, Christian was required to show that (1) his counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that counsel's "deficient performance prejudiced" him, id. at 687. The court must "evaluate the conduct from counsel's perspective at the time," id. at 689, and "apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance," Harrington, 562 U.S. at 104 (internal quotation marks omitted), in order "to eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689.  In all cases, the petitioner's "burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington, 562 U.S. at 104 (internal quotation marks omitted). To show prejudice in the guilty-plea context, the petitioner must "demonstrate 'a reasonable probability that, but for

32

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" Premo v. Moore, 562 U.S. 115, 129 (2011) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

Even without § 2254's deference, the Strickland standard "is a most deferential one." Harrington, 562 U.S. at 105. "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge" and "[i]t is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." Id. (internal quotation marks omitted). When Strickland's deferential standard for evaluating the Sixth Amendment claim is viewed under the extra layer of deference that § 2254 demands, the "review must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." Woods, 135 S. Ct. at 1376 (emphasis added) (internal quotation marks omitted). "[F]ederal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Id.

Moreover, "special difficulties" arise when federal judges are called upon to evaluate trial counsel's actions in the context of a state court guilty plea, where "the record . . . is never as full as it is after a trial," and "the potential for

33

the distortions and imbalance that can inhere in a hindsight perspective may become all too real." Premo, 562 U.S. at 125.

"[T]he guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system," Blackledge v. Allison, 431 U.S. 63, 71 (1977), and the advantages that they provide to all concerned "can be secured . . . only if dispositions by guilty plea are accorded a great measure of finality." Id. "[R]epresentations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Id. at 73-74. Such "[s]olemn declarations in open court carry a strong presumption of verity" and "subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. at 74. "More often than not a prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea," because "[i]f he succeeds in vacating the judgment of conviction, retrial may be difficult." Blackledge, 431 U.S. at 71. "These considerations make strict adherence to the Strickland standard all the more essential when reviewing the choices an attorney made at the plea bargain stage." Premo, 562 U.S. at 125.

34

B.

Finally, a determination of whether the West Virginia Supreme Court's rejection of Christian's recidivist-advice claim "resulted from an unreasonable legal or factual conclusion" beyond any fairminded disagreement "does not require that there be an opinion from the state court explaining the state court's reasoning." Harrington, 562 U.S. at 98. Where the "state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. And before we can overcome the formidable barriers to relief and upset the finality of a guilty plea, we "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 786.

Because the state supreme court did not specify whether it rejected Christian's claim "because there was no deficient performance under Strickland or because [he] suffered no Strickland prejudice, or both," Premo, 562 U.S. at 123, we cannot "overcome the limitation imposed by § 2254(d)" unless "both findings would have involved an unreasonable application of clearly established federal law as determined by the Supreme

35

Court, id. (emphasis added), or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d).

V.

In order to properly determine whether the West Virginia state court's rejection of Christian's recidivist-advice claim "resulted from an unreasonable legal or factual conclusion," Harrington, 562 U.S. 98, we must first define the claim -- a task that has been made unusually difficult here by the evolving nature of Christian's claim as he has progressed through the state and federal post-conviction process.

On appeal to this court, Christian argues that the state court's rejection of his recidivist-advice claim was "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" in Rompilla v. Beard, 545 U.S. 374 (2005). The factual premise of this claim, however, is Christian's new assertion that trial counsel failed to investigate his prior felony record and incorrectly "advised Christian that, if convicted of any one of the three counts against him, Christian would be sentenced to mandatory life in prison without eligibility for parole for fifteen years." Appellant's Brief at 6 (emphasis added); id. at 17 (asserting that on the morning of the plea, when Christian "had second thoughts" about the plea agreement, "[h]is counsel

36

again advised him that pleading guilty to even one of the counts would subject him to a mandatory life sentence") (emphasis added).

This argument was not made to the state court. Christian did not allege or argue that trial counsel incorrectly advised him that he would be sentenced to mandatory life in prison without eligibility for parole for fifteen years if he were convicted of any of the three counts pending against him. Nor did Christian or Henderson testify to this effect. Rather, Christian alleged only that, on the morning of his plea, when he expressed a desire to plead guilty to just the malicious assault charge, counsel told him that the state prosecutor could "seek a sentence in accordance with West Virginia's recidivist laws." Christian represented that he "interpreted [this] as meaning a mandatory life sentence," but nothing in the record supports the conclusion that Christian ever communicated this alleged "interpretation" to Henderson. J.A. 183 (emphasis added); S.J.A. 24. At best, Christian only summarily testified that he "believed" he was subject to a recidivist life sentence, based upon counsel's advice, but provided no specifics in support.

Consequently, we do not consider whether trial counsel would have been constitutionally deficient if he had incorrectly advised Christian that he would be sentenced to mandatory life in prison if he pled guilty or was convicted of any of the three

37

charges pending against him. Rather, we only consider whether the state court's rejection of the claim Christian presented to it represents an unreasonable interpretation of the facts, based on the evidence presented to it, and an unreasonable application of the "clearly established" principles of Strickland and Rompilla, "beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. We have no trouble concluding that it was neither.

## A.

In Strickland, the Supreme Court held that competent counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. In Rompilla, the Court applied this requirement in the context of defense counsel's failure to examine Rompilla's prior conviction file in advance of the death-penalty phase of his capital trial. See Rompilla, 545 U.S. at 383. The Supreme Court held that defense counsel's failure to do so was deficient performance because counsel knew that the prosecution "intended to seek the death penalty by proving that Rompilla had a significant history of felony convictions." Id.

### 1.

Christian argues that because Henderson knew that the prosecution could rely upon Christian's prior felony record to

38

pursue a recidivist sentence against him if he were convicted, _Rompilla_ clearly established a duty upon his counsel from the outset to investigate his felony record.  We disagree.

Neither _Strickland_ nor _Rompilla_ clearly establishes a duty upon counsel to investigate a defendant's prior felony record during the course of plea negotiations, regardless of the circumstances.  On the contrary, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  _Strickland_, 466 U.S. at 691.

The circumstances in _Rompilla_ at the time of Rompilla's death-penalty trial are markedly different from the circumstances present at the time of Christian's guilty plea. Christian told his counsel from the outset that he was guilty of the offenses and instructed him to negotiate a plea agreement that would allow him to serve as much of his expected state prison time as possible concurrently with his federal time. Christian never went to trial, no recidivist information was filed against him, and no recidivist proceedings were held.

Even if we were to extend _Rompilla_ to circumstances where counsel grossly misinforms his client about his sentencing exposure, and negotiates and recommends a plea deal based upon the error, this too is not the situation at hand.  Cf. _United_

39

States v. Lewis, 477 Fed. Appx. 79, 82 (4th Cir. 2012) (unpublished) (finding deficient performance where it was undisputed that counsel "gave legal advice predicated on a plainly false interpretation of federal law" pertaining to the defendant's prior felony convictions, and "gross[ly] misinform[ed]" him that that "he would receive a mandatory life sentence" if he rejected the plea agreement and was convicted) (quoting Ostrander v. Green, 46 F.3d 347, 355 (4th Cir. 1995)).

As noted above, the record belies Christian's new claim that counsel affirmatively misadvised him that he would receive a mandatory recidivist life sentence if he were convicted of any of the three felonies. Nothing in the record supports a conclusion that any part of Henderson's interactions with Christian, the prosecutor, or the state court were based in any way on a belief that a mandatory life sentence under the recidivist statute was involved in this case. On the contrary, Christian's exposure to a recidivist enhancement was not mentioned in the plea negotiation letters and the suggested sentencing scenarios were at all times well below the non-recidivist sentences that counsel testified had been imposed following trials in similar cases. It appears that during the negotiations between the prosecutor and defense counsel, the use of the recidivism statute was taken off the table, so to speak. It also appears that the overriding concern was Christian's

40

desire to go to federal prison first and serve as much of his time there as possible.

To the extent that Christian relies upon the fact that counsel specified in the final plea letter that "NO RECIDIVIST" information would be filed, this too does not compel a finding that the plea negotiations were premised upon counsel's belief that Christian actually faced a recidivist life sentence.

It is undisputed that Christian was subject to having a recidivist information filed against him based upon his prior felony convictions, and any recidivist proceeding would have postponed Christian's primary goal of transferring immediately into federal custody. Fully consistent with the record in this case, Christian could have been subject to a recidivist enhancement under the applicable West Virginia statute because it is undisputed that his prior felony conviction would have made his convictions on any of the pending charges a second felony offense. This point was made explicitly clear to Christian by the state court judge prior to engaging in the guilty plea proceeding as more fully discussed below. Thus, the determinant sentence of ten years on the robbery convictions could be increased by five years or the indeterminate sentence for the malicious assault of a police officer could be doubled. It is entirely reasonable to conclude any effort by Henderson to eliminate a recidivist enhancement through the plea agreement

41

was based on the underlined uncontested fact that Christian could have been subject to the foregoing five-year or double-sentence enhancements in any event. Even if we were to assume Henderson made a cognizable error in failing to investigate Christian's prior felonies for purposes of the three-strike felony enhancement, he would have still needed to negotiate the same "no recidivist" covenant in order to eliminate the second felony enhancement: a factor in which Christian expressed no interest and chooses to ignore on appeal.

Moreover, the state prosecutor would not have been precluded from filing such an information, even though the guilty plea was to be entered pursuant to a plea agreement that set forth the applicable non-recidivist sentence, unless the prosecutor expressly agreed "to waive a recidivist action in exchange for petitioner's plea," or the defendant could thereafter show that the state "led him to believe that it would not file a recidivist information against him." Gardner v. Ballard, 2014 WL 5546202, *2 (W. Va. 2014) (unpublished). Thus, the state court could have reasonably found that counsel's insistence on the no-recidivist term reflected not deficient performance at all, but rather his good efforts to ensure that his client was not subjected to a separate recidivist two-strike enhancement under § 61-11-18(a) after he pled guilty, or to the

42

accompanying delay a recidivist proceeding would have had upon Christian's ability to quickly transfer into federal custody.

Accordingly, the state court could have reasonably concluded that it was not constitutionally deficient representation for counsel to choose not to investigate the details of Christian's prior felony convictions, and instead concentrate on negotiating a reasonable, non-recidivist plea agreement that accomplished Christian's non-sentencing goals as well.

2.

We likewise cannot say that Christian established, beyond any possibility of fairminded disagreement, that counsel was constitutionally deficient under Rompilla for failing to investigate Christian's felony record on the morning of the plea.

Under Christian's version of the events, after Christian informed counsel of his decision to plead guilty to the malicious assault charge and to go to trial on the armed robbery charges, counsel informed the court and then came "back and . . . describe[d] to [Christian] what would happen . . ., and we had some concerns about that." J.A. 554. However, Christian provided no specifics about these concerns and instead testified that the discussions did not change his decision. Rather, he testified that he only decided to go through with "the original

43

deal" after further, and again unspecified, discussions with the prosecutor and his counsel.

Christian was aware that he faced sentences up to and including two terms of life imprisonment if he were convicted of the armed robberies at trial, plus the 3-15 years for the police-officer shooting, without regard to any recidivist sentencing. Christian was also made aware of the likely sentences he faced based upon counsel's knowledge of similar trials and his experience with the particular trial judge. Under a generous reading of the record, the most that can be said is that counsel correctly advised Christian that he might also be subject to a <u>recidivist</u> sentence of life in prison, if he had two usable felonies that the prosecutor could prove in that proceeding. And, of course, any recidivist proceeding would trigger the need for a presentence investigation and an accompanying delay in his primary quest to be immediately transferred to federal prison. But that <u>accurate</u> advice is a far cry from the "gross misinformation" that this court has found constituted deficient performance.

Given the severity of the crimes, the non-recidivist sentencing exposure that Christian faced, and the representations made immediately after the alleged recidivist conversations, we think the state court could have reasonably concluded that Christian had failed to prove that counsel was

constitutionally deficient for failing to immediately investigate the status of Christian's felonies in the wake of his last-minute decision to back out of the plea agreement. Indeed, it seems much more likely that Christian was instead reminded of the reasons why he had agreed to the plea agreement in the first place. There was overwhelming evidence against him, he already faced the prospect of two life sentences without regard to any recidivist enhancement, his determinate sentencing exposure was practically unlimited, and rejecting the agreement would cause him to lose the benefit of the bargain that allowed him to be immediately transferred into federal custody and serve his time there first. Certainly, we think the state court could have reasonably found, in light of all of the circumstances, that "counsel's representation was within the wide range of reasonable professional assistance." Harrington, 562 U.S. at 104.

## B.

We also think the state court could have simply and reasonably rejected the factual premise of Christian's claim that he believed, at the time he entered his plea, that he was subject to a recidivist life sentence. See Blackledge, 431 U.S. at 74 (In the post-conviction proceedings seeking to overturn a guilty plea, "conclusory allegations unsupported by specifics is

subject to summary dismissal, as are contentions that in the fact of the record are wholly incredible.").

Setting aside Christian's evolving factual and legal allegations during the post-conviction process, Christian's testimony at best consisted of his self-serving and conclusory statement that he "believe[d]" he would be subject to a recidivist sentence of life imprisonment based on counsel's "advising [him] of that." J.A. 553. Although Christian also testified that counsel discussed with him "what would happen" and the "concerns [they had] about that," he provided no specifics about this and, at times, appears to have been intentionally vague. J.A. 554.

In contrast, when testifying in support of his claim that he pled guilty because counsel refused to prepare for trial and pressured him to plead guilty instead, Christian testified with much specificity regarding counsel's advice as to the determinate terms of imprisonment that he would face if he were convicted of the robbery offenses. According to Christian, his counsel:

> would come in and tell me all the negative, you know, you've got to, you know, you're caught red-handed with a smoking gun, you've got people that identified you out of a photo lineup, you got Adams who implicated you, you've got Sergeant Johnson who has testified to this, and he would mention things like you're going to get 100 years in prison. And quite frankly, I know as odd as this may sound, I told him that I did not care if I got 2 or 300 years, I wanted a trial.

46

J.A. 563 (emphasis added); see also J.A. 548 ("I remember one time him yelling, You're going to get 100 years in prison just for one robbery like the other guy did. And . . . I said, I do not care if I get 300 years in prison, I want a trial.") (emphasis added).

When Christian first raised his recidivist-advice claim before the state supreme court, he pointed to this same "determinate sentence" testimony in support of his alleged recidivist belief, arguing that:

> [c]ontemporaneously with counsel's reference to the state's recidivist laws, counsel would also make reference to lengthy prison sentences such as "You're going to end up spending the rest of your life in prison," and "You're going to get a 100-years." Consequently, Petitioner interpreted counsel's assertions as meaning "a mandatory life sentence."

S.J.A. 26 n.6 (quoting hearing transcript at J.A. 563). Unfortunately for Christian, however, the referenced testimony does not pertain to events that occurred on the morning of his guilty plea, or to counsel's recidivist advice. Moreover, Christian altered his alleged testimony to support his post hoc attempt to call into question counsel's advice as to his recidivist exposure. Although Christian did testify that counsel told him that he was "going to get 100 years in prison" if convicted of the robberies based upon the evidence against him, J.A. 563; see also J.A. 548 (testifying that counsel told him he was "going to get 100 years in prison just for one

47

robbery like the other guy did"), the testimony did not include the language that he was "going to end up spending the rest of [his] life in prison.'" S.J.A. 26 n.6. While perhaps true, given his non-recidivist exposure and poor health, Christian's misrepresentation to the state supreme court strikes another blow to his credibility.

Henderson's testimony actually offers more support for Christian's claim than Christian's own testimony does, but it is simply too speculative and qualified to cast aside the "benefit of the doubt" that AEDPA demands we give to both the state court's view of the evidence and to counsel's representation of his client. Woods, 135 S. Ct. at 1376 (internal quotation marks omitted). Counsel made it clear throughout his testimony that he did not recall the specifics of any conversations that occurred during his representation, nor did he testify that he told Christian that he would receive a recidivist sentence of life imprisonment if he pled guilty to just the malicious assault charge. As noted above, counsel testified that, although he did not recall the conversation, he would have correctly explained to Christian that, if he entered a plea to the single charge and had two prior felonies that the prosecution could prove were "usable" felonies under the recidivist statute, he would be subject to a recidivist life sentence.

Given the evidence closer in time to the actual events, the state court could also have reasonably found all of this testimony insufficient to satisfy Christian's burden. Just one month prior to Christian's guilty plea, Christian offered to plead guilty to just the malicious assault charge and go to trial on the robberies, with the sole proviso that the 3-15 year sentence would be served concurrent with his 5-year federal sentence. Clearly, no one believed at that time that Christian would be signing up for a mandatory, recidivist sentence of life in prison by pleading guilty to the single count and going to trial on the remaining two counts.

Immediately after the alleged recidivist conversation took place between Henderson and Christian, the state trial court informed Christian that the crimes to which he was pleading guilty would count as the <u>second</u> strike against him and, if he were to be found guilty of a felony in the future, could be used to increase his penalty to "life in prison because it would be strike three." J.A. 270 (emphasis added). Thus, the trial court was made aware that Christian had <u>one</u> prior felony, and Christian confirmed his understanding of the situation. Christian did not inform the court, in response to this statement, that he had just been led to believe that he already had two strikes and already qualified for a recidivist life-in-prison sentence.

49

Finally, in a letter to Christian dated December 6, 2004, Henderson set forth the specific terms of the plea agreement as including the proviso that "[n]o recidivist [would be] filed by the State for your previous felony." J.A. 599 (emphasis added). Consequently, counsel pointed out, "no recidivist was filed against you, you were allowed to waive your PSI and were sentenced on the date of your plea, there was no mention of your Hepatitis C condition as a factor in the plea agreement and the prosecutor did call federal authorities to speed up your transfer to federal custody." J.A. 599-600.

## VI.

Finally, Christian is not entitled to federal habeas relief because the state court could have reasonably concluded that there is no "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" Premo, 562 U.S. at 129 (quoting Hill, 474 U.S. at 59). Put another way, even if we assume Christian's counsel rendered deficient performance, he has no cognizable claim that "deficient performance" prejudiced him.

## A.

Throughout the state post-conviction proceedings, Christian has been opportunistic as to the circumstance that he alleged "coerced" him to plead guilty. For example, Christian claimed he would not have pled guilty if he had been aware of certain

50

exculpatory evidence that was withheld from him or downplayed by counsel. He claimed the trial court's failure to go over the plea questionnaire with him, and to adequately explain his constitutional rights, affected his decision. He claimed that he pled guilty because he was denied a speedy trial and because he did not believe he would be given a public trial. He also claimed that he pled guilty because counsel refused to investigate his claims of innocence and prepare for trial.

But Christian's most vociferous "involuntary-plea" claim, and really the only one that was alleged with any specificity in the state habeas pleadings and proceedings, was that he was coerced into pleading guilty in order to escape the abuse he was being subjected to at the Cabell County Jail. Christian testified that he was assaulted and threatened by the correctional officers, that he "was thrown in solitary confinement for no reason," that he was constantly exposed to secondary smoke that made his eyes water, as well as to temperatures in excess of 100 degrees, and that he was forced to sleep on the floor. J.A. 556-57. Christian testified that these "[h]orrific" jail conditions "[a]bsolutely" influenced his guilty plea," J.A. 556-57, and "alone . . . could have propelled an individual to plead guilty just to get away from th[em]." J.A. 556 (emphasis added); see also J.A. 577 ("I was a rag doll and they beat the hell out of me" and "I come in here and plead

51

guilty to crimes I didn't want to plead guilty to."); J.A. 581 ("[T]hey tortured the living daylights out of me for months that I can't describe to you.").

Christian repeatedly claimed that, but for these alleged deficiencies on the part of his counsel and the court, and the conditions of his confinement, he would not have pled guilty. However, Christian never claimed that "had counsel correctly informed him about his [recidivist exposure], he would have pleaded not guilty and insisted on going to trial." Hill, 474 U.S. at 60. On the contrary, Christian testified that, even though he believed he was facing a recidivist life sentence if he went to trial, he "still did not [waver]" and only changed his mind after further, unspecified conversations were had with the prosecutor and counsel. J.A. 554.

Even if he had made the factual claim that he would not have pled guilty but for counsel's recidivist advice, the state supreme court could have reasonably rejected it as "wholly incredible." Blackledge, 431 U.S. at 74"); see also Merzbacher v. Shearin, 706 F.3d 356, 366-67 (4th Cir. 2013) ("[I]t is entirely clear that to demonstrate a reasonable probability that he would have accepted a plea, a petitioner's testimony that he would have done so must be credible."). After all, the state court rejected Christian's testimony in every way that mattered to the claims that he raised, including testimony that he had

52

constantly maintained his innocence, did not direct counsel to negotiate a plea deal, and always wanted to go to trial. The state court also rejected Christian's self-serving testimony that he was being abused at the jail, and that counsel exploited this alleged abuse to force him to plead guilty. The state court further rejected Christian's testimony that counsel pressured him into pleading guilty, finding that he had failed to "articulate any specific factor of pressure that had its origins in the words or testimony of [his] counsel" and "did not state with even a modicum of specificity any instance where counsel pressured [him] to enter a plea." J.A. 256. And the state court found that Christian had failed to establish "that [his] guilty plea was motivated by an alleged act of counsel's incompetency." J.A. 249.

While the state court did not elaborate upon these more general findings, we note that Christian's own testimony contradicts his claim. Christian now claims that he pled guilty under the terms of the plea agreement because counsel led him to believe that he would receive a recidivist sentence of life imprisonment if he were convicted of any of the three charges. However, when testifying in support of his overarching claim that he was actually innocent and that counsel pressured him into pleading guilty, Christian testified that he developed "buyer's remorse" after the plea and that, within hours of his

53

guilty plea, he tried to withdraw it.  However, Christian did not testify that he wanted to withdraw it because in the course of those few hours he had discovered that he was not subject to a mandatory recidivist life sentence.

In addition, the state court record includes numerous other indications that Christian admittedly would lie about factual matters if he believed it might benefit him to do so.  For example, Christian told the police and his counsel, immediately after the shooting, that he thought Officer Combs was a "black drug dealer that [he had] just robbed."  J.A. 383.  In state habeas proceedings, Christian did not dispute that he made this statement.  Rather, he claimed that he "made[]up" the story, and that counsel was ineffective in failing to move to suppress this incriminating statement prior to his entering his plea.  J.A. 374, 574-75, 577.  Similarly, Christian told the state trial judge (and Officer Combs) that he only committed the crimes because he was a first-time drug user under the influence of crack cocaine.  At the state habeas proceeding, however, Christian vehemently denied using drugs, and claimed that this additional, prejudicial "admission" to the crimes before the state trial court was nothing more than a "false claim before the court that my actions were the result of first time drug usage so that I could later file [a] reconsideration motion[]" for an alternative sentence.  J.A. 457.  Of course, Christian

54

claimed that he lied at the guilty plea hearing about most everything else as well, including his representations that he was guilty of the offenses, that he was totally satisfied with his trial counsel, and that the prosecutor had never talked to him about his plea outside the presence of his counsel.

In light of this record, the state court could also have reasonably rejected, as wholly incredible, Christian's self-serving, conclusory, and belated assertion that, but for counsel's failure to investigate his prior felony record and counsel's recidivist advice on the morning of his plea, he would not have pled guilty and would have insisted on going to trial on the robbery charges.

## B.

The state court could also have reasonably rejected Christian's claim of prejudice because his decision to reject the plea agreement and proceed to trial on the robbery counts would not have been a rational one. See Padilla v. Kentucky, 559 U.S. 356, 372 (2010).

When evaluating objective reasonableness under the prejudice prong of Strickland, "[t]he challenger's subjective preferences . . . are not dispositive; what matters is whether proceeding to trial would have been objectively reasonable in light of all of the facts." United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012). The challenger "cannot make that

showing merely by telling [the court] now that [he] would have gone to trial then if [he] had gotten different advice." Pilla v. United States, 668 F.3d 368, 372 (6th Cir. 2012). In other words, to obtain relief from a guilty plea, the defendant must do more than allege he would have insisted on going to trial if counsel had not misadvised him as to the consequences of that decision. The "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla, 559 U.S. at 372; see also Roe v. Flores-Ortega, 528 U.S. 470, 486 (2000).

Here, the record evidence of Christian's guilt was overwhelming. An eyewitness to one of the armed robberies pointed the police officers to Maynard's apartment. The car matching the description of the robbery get-away car was parked in front of the apartment. Christian ambushed Officer Combs as soon as he walked into the apartment, and even he does not dispute that he was "caught red-handed with a smoking gun." J.A. 563. Adams was also present in the apartment, confessed to the robberies, and implicated Christian as his accomplice. At least one of the robbery victims identified Christian out of a photo lineup. And another investigating police officer testified that Christian admitted that he "figured it was the police" coming into Maynard's apartment "because [he] had just robbed a place." J.A. 374.

Christian faced a non-recidivist sentence of up to life in prison if convicted of either robbery, and a single life sentence would have disqualified him from an early release based on good-time credits. In the event that Christian received a determinate term-of-years sentence proportionate to the 60 to 80 years that counsel testified had been upheld by the state supreme court in similar cases for a single armed robbery, Christian -- who was charged with two armed robberies and the shooting of an investigating police officer -- faced determinate sentences that carried parole eligibility provisions worse than those applicable to even a recidivist life sentence, and far worse than he faced under his plea agreement. Christian does not contend that counsel misled him or incorrectly advised him as to this non-recidivist exposure, nor does he dispute the accuracy of counsel's representation that he would likely get a sentence of 100 years irrespective of any recidivist enhancement.[5]

---

[5] Christian now seeks to paint his plea agreement as one imposing an onerous 40-year sentence that he would have agreed to only if he believed he was facing a mandatory recidivist sentence of life imprisonment, and he claims that he would have instead only faced a minimum sentence of 10 years imprisonment for the robberies and the malicious assault. This is a rosy picture to say the least. This scenario would have required the trial court to impose the minimum sentences for both armed robberies (10 years each), and the malicious assault (3-15 years), and order all three sentences to be served concurrently, which the record indicates was never a realistic possibility. (Continued)

Under the circumstances, we have no trouble concluding that the Supreme Court of Appeals of West Virginia could have reasonably found that Christian had little hope of prevailing at trial on the charges and was "lucky to receive the deal that he did." Fugit, 703 F.3d at 260. The state court could also have reasonably found that Christian's decision to reject a plea agreement that allowed him parole eligibility from his state sentence in less than 11 years, the opportunity to exhaust his state sentence in less than 20 years, and the ability to transfer immediately into federal custody, which everyone agreed at the time and on the record was in his best interest, would have been an objectively unreasonable one. See Premo, 562 U.S. at 129 (rejecting claim because "[t]he state court . . . reasonably could have determined that [petitioner] would have accepted the plea agreement" despite counsel's alleged deficiencies because "the [s]tate's case was already formidable," the petitioner "faced grave punishments," and

---

It would also have required the trial court to impose the mandatory recidivist sentence to the malicious assault sentence, instead of to a robbery sentence. In other words, the trial court would have had to impose a mandatory recidivist sentence that would not have increased the defendant's sentence at all. In light of the severity of the charges, the high-profile nature of the officer shooting, and the evidence of the victims' involvement in the prosecution of the charges, the state supreme court could have reasonably evaluated the likelihood of that occurring as miniscule at best.

58

"[t]he bargain counsel struck was . . . a favorable one"); cf. Pilla, 668 F.3d at 373 (concluding that proceeding to trial would have been irrational where defendant "faced overwhelming evidence of her guilt" and "had no rational defense, would have been convicted and would have faced a longer term of incarceration") (internal quotation marks omitted).

## VII.

This case squarely presents the "special difficulties" that arise when federal judges are called upon to evaluate trial counsel's representation in the plea context, where "the record . . . is never as full as it is after a trial," "the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real," Premo, 562 U.S. at 125, and the petitioner "has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea." Blackledge, 431 U.S. at 71.

Here, abundant evidence exists to support a factual finding that Christian's guilty plea was driven not by his sentencing exposure at all, which everyone agrees was onerous, but rather by his recognition from the outset that he had little hope of defeating either the federal or state charges against him, or of living long enough to get out of prison at all, and by his desire to spend as much of his remaining life as possible in federal prison. Christian may well have developed "buyer's

59

remorse." J.A. 555. However, a defendant's decision to plead "guilty generally involves a conscious decision to accept both the benefits and burdens of a bargain [and] [t]hat decision [should] not be lightly undone by buyer's remorse on the part of one who has reaped advantage from the purchase." Fugit, 703 F.3d at 260.

In cases such as this, "strict adherence to the Strickland standard [is] all the more essential," Premo, 562 U.S. at 125, and we cannot say that the state court's application of the Strickland standard, in light of the evidence presented to it in the state court proceedings, was unreasonable. Accordingly, we hold that Christian has failed to demonstrate that he is entitled to federal habeas relief from his plea of guilty to the state charges.

AFFIRMED

60

GREGORY, Circuit Judge, dissenting:

The majority goes to great lengths to disguise the simple truths of this case: Counsel gave bad advice to a client, and the client relied on the advice in deciding to plead guilty and forgo his constitutional right to a trial. I respectfully dissent.

I.

On the morning of September 2, 2003, Gregory Christian considered whether to plead guilty in state court to two counts of first degree robbery and one count of malicious assault on a police officer. In negotiations with the government, Christian had been mindful of the impact his two prior felony convictions could have on any sentence imposed under the state's recidivism laws. Indeed, Christian had gone so far as to condition his tentative plea agreement on the demand that "NO RECIDIVIST [BE] FILED!" J.A. 597.

As became clear on the morning of the plea hearing, Christian's attorney, Gerald Henderson, assumed that the prior felonies could trigger a mandatory minimum life sentence if Christian was convicted of any of the new charges. That assumption was plainly false. Because Christian's two felonies were entered on the same day, they only counted as one strike under the West Virginia's recidivism scheme. Henderson,

61

however, had failed to investigate his client's criminal record after being told of the existence of the two felonies.

At the hearing, Christian told Henderson that he wanted to plead guilty to only the malicious assault charge, and proceed to trial on the robbery charges. Henderson warned Christian that "if you enter a plea to a felony with no agreement that the state won't recidivist, then they have every right to file their recidivist petition." J.A. 516-17. As Henderson further recalled:

> I would have told you that pleading to the one count, if you have two usable felonies, which you told me, then of course that's not in your best interest for them to give you life without eligibility if they can prove those priors. . . .

> I explained to you, would have explained to you that you understand that if you enter a plea to this charge and you have two felonies, as you told me you did, that they could file a petition, and if they prove those felonies that are usable felonies under law, that you could get life without eligibility for 15 years. I would have advised you of that.

J.A. 518-19.

Despite the thin veneer of 'hypotheticals', Henderson's testimony clearly establishes that (1) Christian told him of the two prior felony convictions; (2) Henderson did no further investigation to determine the date or nature of the prior felonies; (3) on the basis of Christian's disclosure, Henderson advised him that he faced a possible mandatory minimum life sentence if convicted of any of the new charges; and (4) the

62

advice Henderson gave was incorrect because under no circumstances did Christian face such a sentence if convicted.

## II.

Against that factual backdrop, the question we face is simply whether the state court's rejection of Christian's habeas petition involved an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984), and its progeny. Specifically, would it have been unreasonable for the state court to believe that defense counsel's performance was adequate and, if so, would it have also been unreasonable to believe that Christian suffered no prejudice as a result of the deficient performance?

### A.

Regarding the objective reasonableness of counsel's performance, the pivotal question is this: did Henderson breach an established duty to investigate and provide sound advice about whether Christian's prior felonies counted as separate for recidivism purposes in West Virginia? The answer is clearly yes. As Strickland established, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Building on that precedent, both the Supreme Court and this Court have consistently held that an attorney has a duty to investigate a client's criminal record, in addition to other

63

aspects of a client's background, when the record has a bearing on the current proceedings.  In Rompilla v. Beard, for instance, the Supreme Court held that "lawyers were deficient in failing to examine the court file on [a defendant's] prior conviction" when the lawyers knew the government intended to rely on the prior conviction during sentencing.  545 U.S. 374, 383 (2005).  Similarly, in United States v. Russell, 221 F.3d 615, 621 (4th Cir. 2000), this Court concluded that defense counsel was ineffective for failing to adequately scrutinize and contest evidence of a defendant's three prior felony convictions that the government sought to introduce for impeachment.  As we observed:  "When representing a criminal client, the obligation to conduct an adequate investigation will often include verifying the status of the client's criminal record, and the failure to do so may support a finding of ineffective assistance of counsel."  Id. at 621.*

---

* Still more on point, this Court more recently held in an unpublished decision that bad advice about the applicability of a recidivism statute can constitute ineffective assistance. United States v. Lewis, 477 F. App'x 79, 82 (4th Cir. 2012).  In Lewis, counsel advised a defendant during plea negotiations that he faced a mandatory life sentence and was a career offender under the Federal Sentencing Guidelines because of two prior convictions.  Id. at 80.  The defendant, after some hesitancy, accepted the government's plea bargain.  Id.  But under Ohio law, the prior convictions did not trigger a mandatory life sentence or career-offender status.  Id. at 81-82.  This Court found counsel's contrary advice to be "plainly deficient under Strickland."  Id. at 82.  As we observed, "[h]ad [counsel]
(Continued)

64

Here, Henderson failed to investigate his client's criminal record – either by asking more questions or pulling a file – when accurate information was critical to the client's ability to make an informed, intelligent choice about whether to accept a plea deal. Indeed, Christian made clear during plea negotiations that his desire to avoid a recidivism enhancement was a significant motivating factor for accepting a deal – as revealed by the letter Henderson wrote to the government expressing Christian's demand that "THERE WILL BE NO RECIDIVIST FILED". J.A. 597. Doing a minimally sufficient investigation into Christian's record would have involved very little effort, requiring a simple examination of the dates of the two prior felony convictions. And the reward would have been significant, fundamentally changing Christian's calculus in deciding whether to forgo his Sixth Amendment right to a trial.

Of course, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."

---

simply read the applicable federal statutes and correctly applied them to the facts of this case, they would have discovered their error." Id.; see also Hammond v. United States, 528 F.2d 15, 17-18 (4th Cir. 1975) (observing, before Strickland, that counsel's incorrect advice about possible sentences constituted ineffective assistance).

65

Strickland, 466 U.S. at 691.  But there is no showing in this record that Christian told Henderson that the convictions at issue were entered on different days, or that he otherwise dissuaded further investigation.  The record thus supports the conclusion that it would have been an unreasonable application of clearly established law for the state court to find Henderson's performance objectively reasonable.

B.

The question of prejudice hinges on whether Christian has shown "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985). Again, the record provides a rather conspicuous answer. According to Henderson's erroneous advice, Christian faced a mandatory life sentence, with the possibility of parole after 15 years, if convicted of any of the three counts against him.  In reality, Christian faced a mandatory minimum sentence of 10 years (if the sentences ran concurrently), even if convicted of all counts.  He pled guilty to a sentence of 28 to 40 years imprisonment without the possibility of parole for approximately 11 years.

Christian's conduct reveals just how central Henderson's erroneous advice was in his decision-making.  As previously described, Christian expressly stated during plea negotiations

66

the conditions under which he would accept a deal, as reflected in a letter written by Henderson to the government. The letter provided:

> [Christian] is willing to enter a plea under the following terms:   . . . (h) THERE WILL BE NO RECIDIVIST FILED!!!

J.A. 597. By the letter's own terms, Christian was acutely aware of and concerned with the impact his two prior felonies could have on any sentence. More telling, Christian actually decided to reject the plea agreement on the morning of trial, and only accepted it a short time after he was erroneously reminded by Henderson that he faced the possibility of a mandatory life sentence if convicted of one of the counts.

Of course, as the majority points out, it is possible that Christian would have received a lengthy sentence if he had chosen to go to trial. But the Sixth Amendment right to a public trial does not exist solely when a trial would be in a defendant's best interests. The record here compels a conclusion that it is reasonably probable Christian would have exercised this constitutional right if he received accurate advice.

I respectfully dissent.